Willie **WILLIAMS, et al., Petitioners,**

v.

**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Respondent.**

**No. 88 C 10913.**

United States District Court, N.D. Illinois, E.D.

June 16, 1989.

---

Michael S. Wolly, Mulholland & Wolly, Washington, D.C., Marvin Gittler, Stephen Feinberg, Asher, Pavalon, Gittler and Greenfield, Ltd., for petitioners.

James P. Daley, Stuart F. Gassner, Myles L. Tobin, CNW, Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Willie Williams ("Williams"), Berton Osterman ("Osterman") and International Brotherhood of Electrical Workers ("Union") have sued Chicago and North Western Transportation Company ("CNW"), seeking review of Award No. 709 (the "Award") issued by Special Board of Adjustment No. 570 ("Board"). Both sides have now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56—petitioners

to have the Award set aside and the case remanded, CNW to have the Award enforced. For the reasons stated in this memorandum opinion and order, petitioners' motion is granted and CNW's is denied.

## Background [1]

Union and CNW are parties to a September 25, 1964 Mediation Agreement (the "Agreement") (P.Ex. N).[2] Art. I, § 1 states its purpose is "to afford protective benefits for employees who are displaced or deprived of employment as a result of changes in the operations of the carrier due to the causes listed in Section 2." Art. I, § 2 lists seven such types of changes, the second and sixth of which have been implicated in this case (though, as will be made clear later, the sixth should not have been —see nn. 6 and 12):

> b. Abandonment, discontinuance for 6 months or more, or consolidation of facilities or services or portions thereof;

> \* \* \* \* \* \*

> f. Technological changes.

Railway Labor Act ("Act") § 153 Second [3] permits carriers and unions to establish special adjustment boards to adjust and decide disputes arising from the interpretation or application of collective bargaining agreements. Accordingly Art. VI provides a mechanism for the resolution of certain disputes. It also vests Board with exclusive jurisdiction over disputes arising under Art. I.

On February 13, 1984 CNW notified Union that as of April 13, 1984 it was abolishing all engineer electrician positions, including those of Williams and Osterman (P.Ex.

---

**1.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). Where as here cross motions are involved, that principle demands a dual perspective that sometimes

causes the denial of both motions. However, in this case both parties agree no facts are in dispute.

**2.** All "Art.—, § —" citations in this opinion are to provisions in the Agreement.

**3.** Act sections, found in 45 U.S.C., are cited here by their Title 45 numbering rather than the internal numbering of the Act.

A).[4]  CNW said it was taking that action "[a]s a result of the discontinuation of service at the Lake Street Power Plant and the CPT [Chicago Passenger Terminal]" (*id.*).

Union responded that Williams and Osterman were entitled to protective benefits under Art. I, § 2(b)—an assertion that matched CNW's February 13 statement of reasons with the terms of the Agreement. CNW then changed its story, notifying Union on April 9 that the positions were being abolished for a different reason: a change from high to low pressure boilers (P.Ex. E). Because Board had recently issued an award denying benefits on a similar ground, CNW now asserted Williams and Osterman were not entitled to benefits under the Agreement (*id.*).

CNW and Union then attempted to resolve the dispute. When it became clear no resolution was possible, Union submitted the claim to Board. Both parties then filed written submissions.

By a 4 to 3 vote[5] Board denied the claim based on these holdings:

1.  Williams and Osterman were not entitled to benefits under Art. I, § 2(b) because the facility was not abandoned nor were services discontinued (Award at 3–4).

2.  They were also not entitled to benefits under Art. I, § 2(f) because no technological change had occurred (Award at 4).[6]

Board's three labor members dissented, asserting:

1.  Based on the record, the employees were entitled to benefits under Art. I, § 2(b) (Award Dissent at 1–2).

**4.**  Later the effective date of termination was extended to April 30, 1984 (P.Ex. F).

**5.**  Board membership comprises three CNW designees, three Union designees and a neutral member. In this instance Board's vote followed party lines entirely, so that the neutral member cast the deciding vote.

**6.**  In so ruling Board expressly relied on its prior Award No. 543 as precedent. Award No. 543 was the same ruling CNW cited to Union in support of its position. Board's ruling (and CNW's argument) in that respect are puzzling, to say the least. Union never urged the exist-

2.  Because Union had never advanced a claim based on technological change, Board's reliance on Award No. 543 and its reference to Art. I, § 2(f) were misplaced (*id.* at 1).

3.  Board exceeded its authority when it based its decision on newly submitted evidence not presented to Union during the pre-Board discussions. That violated Art. VI, § 11 (*id.* at 2–4).

*Review of Board's Award*

Review of Board's Award is governed by Act § 153 Second:

Such awards shall be final and binding upon both parties to the dispute and if in favor of the petitioner, shall direct the other party to comply therewith on or before the day named. Compliance with such awards shall be enforcible by proceedings in the United States district courts in the same manner and subject to the same provisions that apply to proceedings for enforcement of compliance with awards of the Adjustment Board.

Act § 153 First (q) then permits this Court to "set aside, in whole or in part" Board's award, or remand it for further action, for any of three reasons:

1.  Board's failure to comply with the Act's requirements;

2.  failure of the award to conform or confine itself to matters within the scope of Board's jurisdiction; or

3.  fraud or corruption by a Board member.

■  Admittedly the scope of judicial review under the Act is among the narrowest known to law (*Union Pacific Railroad v. Sheehan*, 439 U.S. 89, 93–94, 99 S.Ct. 399,

ence of a technological change as a basis for awarding relief to Williams or Osterman—it relied solely on Art. I, § 2(b) and not at all on Art. I, § 2(f). Technological change, or the absence of such change, is therefore a total red herring. If abandonment or discontinuance has taken place (Union's sole contention), relief must be awarded whether or not there has also been technological change; if there has been no abandonment or discontinuance, technological change is still a nonissue because Union never raised it.

401–02, 58 L.Ed.2d 354 (1978) (per curiam)). Consistently with that concept, *Hill v. Norfolk and Western Railway Co.*, 814 F.2d 1192, 1194–95 (7th Cir.1987) (citations omitted) has provided guidance to district courts in this area:

> As we have said too many times to want to repeat again, the question for decision by a federal court asked to set aside an arbitration award—whether the award is made under the Railway Labor Act, the Taft–Hartley Act, or the United States Arbitration Act—is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract.... If they did, their interpretation is conclusive.[7]

▇ But as this Court has previously said, "narrow review is not the equivalent of no review at all" (*Miller v. CNW*, 647 F.Supp. 1432, 1438 (N.D.Ill.1986)). Here Petitioners Mem. 7 urges Board's Award should be set aside because it does not confine itself to matters within the scope of its jurisdiction (the second of the three grounds for judicial reversal listed in Act § 153 First (q)). Petitioners are right.

Art. VI, § 8 limits the evidence the Board may consider:

> The Board shall consider the written submission and relevant agreements, and no oral testimony or other written material will be received.

Art. VI, § 11 then limits the permissible scope of the parties' written submissions:

> Each written submission shall be limited to the material submitted by the parties to the dispute on the property and shall include:
>
> (a) The question or questions in issue;
>
> (b) Statement of facts;

(c) Position of employee or employees and relief requested;

(d) Position of company and relief requested.

Board has consistently interpreted that Section to mean "evidence, issues, or exhibits that have not been discussed and furnished on the property" may not be presented for the first time before Board (Board Award No. 268, at 3). Indeed Board has expressly said (Board Award No. 260, at 2):

> It is the opinion of this neutral that both Management and Labor are subjected to the same rules of evidence: that under these rules, this Board is precluded from considering evidence not considered on the property. There are no exceptions to this rule and none can be implied. There was nothing to prevent Carrier from attaching these exhibits in question in any of their letters of declination or other correspondence while this matter was being handled on the property. Therefore, the objection of the Organization is well taken and Carrier's exhibits 1 through 6 will not be considered. This reduces Carrier's allegation that Claimants were deprived of employment because of a decline in business to mere naked assertions unsupported by probative evidence.[8]

Yet in the teeth of the Agreement's unambiguous provisions and the equally unambiguous Board applications of those provisions, CNW's submission to Board in this case asserted at pages 3–4:

> Furthermore, there is no basis for any contention that the Carrier has abandoned this facility. The Lake Street Power Plant is part of the Chicago Passenger Terminal complex. Although the former station, which housed passenger facilities and offices, has been demolished for new construction, train operations at this depot have not been affect-

---

**7.** [Footnote by this Court] See also *Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Ry. Co.*, 768 F.2d 914, 921 (7th Cir.1985).

**8.** [Footnote by this Court] See also Board Award No. 11, at 2; Board Award No. 184, at 2; Board Award No. 358, at 2. Unquestionably such past Awards are, at the very least, persuasive authority—indeed, the Board here expressly relied on a past Award in ruling no technological change had occurred. But even were that not so, the limiting provisions of Art. VI, §§ 8 and 11 are very clear indeed.

ed. Temporary passenger facilities have been constructed until the completion of a new office building on the site of the former passenger station. There are currently at least 29 positions working in the Chicago Passenger Terminal covered by crafts signatory to the September 25, 1964 Agreement. These positions are as follows:

5 Mechanics-in-Charge
1 Machinist
7 Coach Cleaners
7 Carmen
1 Pipefitter
6 Electricians
1 Stationary Engineer
1 Laborer

No part of that statement of purported facts was supported by any evidentiary submissions, and that forms the basis of petitioners' objection here.[9]

Petitioners represent that CNW neither relied upon that assertion nor even tendered any evidence to that effect when the parties tried to resolve the dispute themselves.[10] CNW cannot and does not deny that failure. Instead CNW R.Mem. 4 says that because P.Ex. K raises the issue of abandonment or discontinuance, CNW "was within its rights to detail these matters."

But that position directly flouts the clear terms of Art. VI, § 11. What the parties agreed on in that section was a plain man-

date: "Present your evidence and arguments before you get to Board or you have waived them." Here CNW unquestionably presented no such evidence or arguments, and just as clearly it was barred from raising the issue afresh before Board.

And there is equally no doubt Board did rely on CNW's unsupported assertion in reaching its Award. Board said (Award at 2–4, emphasis added):

Furthermore, it is Carrier's position that there is no basis for the Organization's contention that this facility has been abandoned, *since train operations have not been affected by the new construction and since currently there are at least 29 positions working in the Chicago Passenger Terminal covered by crafts signatory to the September 25, 1964 Agreement.*

\* \* \* \* \* \*

After careful review of the record in its entirety, we find no evidence of abandonment of the facility in question under the 1964 Agreement. It is well-established that a facility is not considered abandoned or discontinued as long as there are employees still working there. (See, e.g. Award No. 538 (Carrier did not abandon its Cedar Rapids, Iowa facility simply because the last laborer position had been abolished); Award No. 467 [abandonment cannot be implied from the abolition of a single shopcraft's last posi-

---

**9.** Clearly the objection is more than a technical one. For example, though it is a matter of common knowledge to CNW commuters (and this Court is among them) that its train operations continued despite the demolition of the old station and construction of the new office building on the same site, Union had no opportunity at the pre-Board level to deal with the key proposition that "the Lake Street Power Plant is part of the Chicago Passenger Terminal complex." That assertion, implying as it does that Power Plant workers such as electricians Williams and Osterman must be thrown into the same hopper as all Terminal employees for purposes of deciding whether abandonment or discontinuance has taken place, appears to fly directly in the face of:

1. CNW's original notice stating it was abolishing the engineer electrician positions "[a]s a result of the discontinuance of service at the Lake Street Power Plant" and

2. the Art. I, § 2(b) reference to "[a]bandonment [or] discontinuance ... of facilities or services *or portions thereof*" (emphasis added).

Most importantly, CNW's posing of the issue when it did was no different from raising a wholly new issue at the appellate level in a judicial proceeding. This Court does not of course purport to construe the provisions in question on the merits or otherwise to usurp Board's position—only to illustrate how Board's failure to comply with its own jurisdictional limitations as marked out by the Agreement has frustrated the very purpose of those limitations.

**10.** Thus petitioners have two distinct but related objections:
1. CNW raised a totally new issue before Board.
2. No evidence, as contrasted with bare assertions, was presented to support that new position.

tion].) In the instant case, *it is undisputed that Carrier maintains a substantial number of shopcraft positions at this Chicago facility,* and therefore we conclude that Carrier did not abandon its facility within the meaning of Article I, Section 2(b) of the Agreement.

There is no doubt at all that the just-quoted holding relied directly on CNW's new and unsubstantiated submission, for the only proper *evidence* as to continued work at the facility was P.Ex. K showing that three employees were unaffected by CNW's actions (and of course three employees hardly qualify as a "substantial number").

Both CNW's newly presented assertion and Board's reliance on it directly violated Art. VI, § 11. Board thus departed from the Agreement's provisions squarely limiting the evidence it may receive (cf. *Wilson v. CNW,* 728 F.2d 963, 967 (7th Cir.1984)).

Arbitration and its scope are contractual in origin (*AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986)). That means parties are free to tailor both the scope of Board's jurisdiction and the procedures by which it must operate. By using evidence expressly prohibited by the Agreement, Board failed to confine itself to matters within its jurisdiction. Consequently the Award cannot stand.

Were this a review of a judicial determination, this Court could reverse and remand the Award in confidence that a judicial officer—trained to ignore improperly tendered evidence [11]—would decide the dispute anew wholly without reference to CNW's tainted submission. Although Board's members do not share that training, it must be assumed that they can perform the same task in just the same way that juries are called upon to do every day when they are instructed to ignore evidence they have heard that is successfully objected to by the opposing litigant. Due process entitles petitioners (and CNW, of course) to an award based on the record *properly* before Board, with no consideration whatever given to CNW's new assertions as to claimed nonabandonment (or, for that matter, to the prior Award that was based in part on that improperly considered material).

*Conclusion*

There are no genuine issues of material fact, and petitioners are entitled to a judgment as a matter of law. Board's Award is set aside, and the case is remanded with directions that Board consider the case anew but (1) totally without reference to or consideration of CNW's unsupported statement that it has not abandoned or discontinued the facility and that 29 positions still remain and (2) without reliance on the prior Award, based as it was on improper considerations.[12]

---

**11.** That occurs in every bench trial every time an evidentiary objection is sustained.

**12.** To minimize (or even eliminate) the prospect of another return to this Court after Board's reconsideration and its resulting new award, it should again be emphasized that (as Board's dissenting members urged the first time around) any reliance on Art. I, § 2(f) or on Award No. 543 in that respect would be entirely outside of the issues presented to Board for its decision (see n. 6). Only the abandonment or discontinuance question should be decided on remand in accordance with this opinion.