CSX TRANSPORTATION,
INCORPORATED, Plaintiff–Appellant,

v.

UNITED TRANSPORTATION UNION;
General Committee of Adjustment, United Transportation Union, Western Maryland Railway Company, Defendants–
Appellees.

No. 93–2407.

United States Court of Appeals,
Fourth Circuit.

Argued May 11, 1994.

Decided July 21, 1994.

**ARGUED:** Stephen Bennett Caplis, Kevin Charles McCormick, Whiteford, Taylor & Preston, Baltimore, MD, for appellant. L. Pat Wynns, Highsaw, Mahoney & Clarke, P.C., Washington, DC, for appellees. **ON BRIEF:** James D. Tomola, CSX Transportation, Inc., Jacksonville, FL, for appellant. John O'B. Clarke, Jr., Highsaw, Mahoney & Clarke, P.C., Washington, DC, for appellees.

Before MURNAGHAN and WILLIAMS, Circuit Judges, and HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge WILLIAMS and Judge HILTON joined.

## OPINION

MURNAGHAN, Circuit Judge:

CSX Transportation Incorporated ("CSXT") has appealed the district court's affirmance of Arbitration Award No. 22 of Public Law Board No. 4069. That arbitration resolved a dispute between CSXT and the United Transportation Union ("UTU") and requires CSXT to provide end of train devices ("ETD's") on certain of its cabooseless trains.

CSXT has asserted that the district court erred in affirming the arbitration award, because the arbitration board misinterpreted the applicable labor agreement and statutes, or, alternatively, exceeded its authority by ignoring the terms of the relevant collective bargaining agreement.

### I

#### A

Pursuant to the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* (1988) ("RLA"), and Executive Order 12373, President Reagan created Emergency Board No. 195 in July 1982 to investigate certain disputes between the UTU and several railroads represented in national bargaining by the National Carriers' Conference Committee of the National Railway Labor Conference. Among the railroads represented was the Western Maryland Railway Company ("WM"), which was subsequently merged into CSXT. One of the issues to be investigated by the Emergency Board was whether and under what circumstances cabooses could be eliminated from rail service.

After conducting hearings on the issue of cabooseless trains, the Emergency Board issued a report to the President. The report stated, that subject to certain conditions and limitations, cabooses could be eliminated in each class of service without undermining safety and operational considerations. The Emergency Board recommended that the

UTU and the railroads negotiate appropriate guidelines to address various issues related to the removal of cabooses and that the parties resolve any disputes about such issues through arbitration. In accordance with those findings, the UTU and the railroads, including WM, negotiated and included in their 1982 National Agreement ("National Agreement") guidelines concerning the removal of cabooses from rail services.

On November 5, 1982 pursuant to provisions in the National Agreement, WM served notice on the UTU of its intention to operate certain trains without cabooses. The parties subsequently were unable to reach an agreement on this issue and, pursuant to the National Agreement, submitted the issue to the National Mediation Board for formal arbitration. Arbitrator Leverett Edwards was selected as the neutral arbitrator. Both parties submitted *ex parte* briefs in support of their positions and presented evidence at a hearing that lasted over a nine day period in June 1983.

On September 7, 1983, the Edwards Board issued its award, finding that cabooses could be eliminated in all classes of rail service subject to a number of conditions. The award did not explicitly require the railroads to employ ETD's as a condition to operating without cabooses; however, as will be discussed more fully below, the use of ETD's was discussed during these proceedings and the award specifically refused to decide the question of whether trainmen/yardmen should be required to perform the rear end device function.[1] The award stated that that issue should be resolved in accordance with the procedures set forth in the RLA.

Approximately four and one-half years later, from February 20 through 23, 1988, CSXT (as the successor of WM), operated several cabooseless trains without ETD's. Subsequently, on April 18, 1988 a local UTU chairman filed a claim with CSXT for two hours penalty pay on behalf of ten claimants who operated the aforementioned trains. On May 17, 1988, the claim was denied on the ground that the Edwards Award did not require the carrier to replace a caboose with anything specific. After exhausting the appeals procedure, the UTU took the claim to arbitration. Pursuant to the RLA, the claim was submitted for resolution to Public Law Board No. 4069. Herbert L. Marx, Jr. was selected as the neutral arbitrator.[2] After considering both *ex parte* submissions and live testimony, the Marx Board concluded that CSXT was obligated to equip the trains that had been the subject of the Edwards arbitration with ETD's and that the failure to do so was remediable by providing two hour penalty pay to the claimants. CSXT then appealed the Marx Board Ruling to the federal district court for the District of Maryland.

### B

Applying the narrow standard of review employed in the consideration of arbitration awards, the district court determined that its role was to decide whether the Marx Board was "arguably construing or applying the contract" in reaching its decision. *See United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987).

The district court found its starting point in the National Agreement into which the parties entered in 1982. Article X of the Agreement addresses the issue of elimination of cabooses as follows:

Pursuant to the recommendations of Emergency Board No. 195, the elimination of requirements for or affecting the utilization of cabooses, as proposed by the carriers in their notice ..., will be handled on an individual basis in accordance with the following agreed upon procedures and guidelines.

Cabooses may be eliminated from trains or assignments in any or all classes of service by agreement of the parties. Cabooses in all classes of service other than

---

**1.** An ETD is a device that is attached to the last car of the train. Such a device marks the rear end of the train with a light as required by federal regulations. In addition, an ETD also determines the rear brake pressure.

**2.** Board No. 4069 also consisted of one representative from the railroad and one from the union.

through freight service are subject to elimination by agreement or, if necessary, by arbitration.

National Agreement, art. X (Ex 2, Attach. B to Am. Pet. For Review of Award No. 22 of Public Law Board No. 4069).

The district court then canvassed the procedural requirements of the National Agreement pertaining to arbitration. It found that pursuant to the Agreement, WM gave notice of its intent to operate certain trains without cabooses on November 5, 1982. The parties met on numerous occasions, but were unable to reach an agreement. On March 17, 1983, WM and other railroads jointly invoked arbitration pursuant to Section 1 of Article X of the National Agreement. In reviewing the transcript of the hearing before Arbitrator Edwards, the district court found that C.J. Shuler, Senior Director of Labor Relations for WM, testified as follows:

The Carrier, as we will explain, has developed, for the use on cabooseless trains, an "end of train" device which fully meets, and, in fact, exceeds the standards imposed by the FRA.
*We stipulate, at this time, that in any cabooseless train operation, ensuing from this proceeding and determination, such equipment will be employed on trains operating without cabooses, where required, to conform with FRA or other regulations.*

CSXT Am. Pet. For Review, Ex. 3, Attach. P at 1–2 (emphasis added). The district court found that in so stating his position with respect to ETD's, Shuler had "at least impliedly recognized some duty and intention to employ ETD's on cabooseless trains...." The district court cited additional language that it took as further evidence that the railroad recognized some duty to provide ETD's. Specifically, the district court cited Shuler's subsequent testimony which dealt with the issues concerning which employees would place the ETD's on the trains and who would receive additional pay for performing that work.

Now, as I said, we are developing a rear end device to comply with the FRA regulations, or any other state statute that might be applicable, and we, from a practical standpoint, certainly will use crafts other than trainmen to place this device on the rear of a cabooseless train in our major yards and terminals, where such employees happen to be on duty and they are available to place it.

The district court found that, at other points in his testimony, Shuler reiterated his belief that ETD's were required to comply with FRA regulations, stating that "[w]e all know that the rear end device is something that not only the Chessie, but other railroads will have to develop in order to comply with FRA regulations" and "I'm not denying that the rear end device must be developed, must be on the rear end of these trains."

The district court cited to the testimony of UTU Vice–President N.G. Jenkins about the importance of the ETD device on cabooseless trains.

It is extremely important to note in summary that too much emphasis cannot be placed on the performance of rear-end device function. The device is recognized by the parties as essential to the operation of trains without cabooses.

*Id.*, Attach. U at 1. The district court found that WM did not refute Jenkins' statement.

Finally, the district court quoted the decision of the Marx Arbitration Board, which held that the ETD's were required on the relevant trains. The Marx Board concluded that:

Here, the Board finds that the carrier's unilateral assurances in the [Edwards] arbitration proceeding, together with the "guidelines" in Article X, Section 2, are sufficient to conclude a commitment to the use of ETD['s]. Failure to do so thus becomes remediable under Article X, Section 7 to the extent of the two-hour penalty prescribed therein.

The district court agreed with the Marx Board, principally on the theory that although the Edwards Award did not explicitly address the use of ETD's, the silence of the Edwards award was attributable to the stipulation that it would use ETD's on cabooseless trains made during the proceedings leading to the Award. The district court also rejected CSXT's argument that the arbitration board had ignored the "common law of the

shop" in rendering its decision, finding that CSXT did not submit necessary documentary evidence to support its argument.

## II

On appeal, CSXT advances essentially three arguments in support of its contention that the Marx Award should be set aside. It argues that 1) it was beyond the Marx Board's authority to conclude that ETD's are required on cabooseless trains since that issue was not presented to Arbitrator Edwards and the Edwards Award and the National Agreement are silent on whether ETD's are required; 2) the Board and the district court misinterpreted the context and content of Shuler's stipulation; and 3) the Marx Board and the district court failed to consider evidence of CSXT's past practices.

## A

■ We have recently reiterated the narrow standard of review applied to arbitration awards.

The orders of a railway labor arbitration panel constituted under the RLA, including those interpreting the panel's own authority are subject to a unique standard of review which is "among the narrowest known to the law." A court may set aside such an award only (1) for failure of the [Board] to comply with the [RLA]; (2) for failure of the order to conform, or confine itself, to matters within the scope of the [Board's] jurisdiction; or (3) for fraud or corruption. 45 U.S.C. § 153 First (q). Under this standard, a court "may not overrule an arbitrator's decision simply because it believes its own interpretation of the contract would be the better one." It may reverse an arbitral decision as in excess of a board's jurisdiction only where the arbitration board's order "does not draw its essence from the collective bargaining agreement," or its interpretation of the contract is "wholly baseless and completely without reason[.]" Of course, an award that ignores the plain and unambiguous language of the arbitration contract does not "draw its essence" from the agreement, and may therefore be overturned under the RLA. But "[a]s long as

the arbitrator is even arguably construing or applying the contract," the arbitrator's award must not be disturbed.

*Norfolk & Western Ry. v. Transp. Com. Intern. Un.*, 17 F.3d 696, 700 (4th Cir.1994) (citations omitted). Accordingly the questions before the court are whether the arbitration board's order draws its essence from the collective bargaining agreement, and whether its interpretation of the contract is wholly baseless and without reason.

## B

CSXT argues that because the issue concerning whether ETD's would be required was never presented to the Edwards Board for resolution, it was improper for the Marx Board to conclude, as it did, that the Edwards Award required the use of ETD's on cabooseless trains. Since the issue of ETD's was not properly before the Edwards Board, CSXT contends, the Marx Board exceeded its jurisdiction in reaching the issue, and, in effect, issued an order that did not "draw its essence from the collective bargaining agreement."

The district court found the above argument "entirely unpersuasive," distinguishing the authorities cited by CSXT on the ground that all involved instances where an arbitrator's award contradicted specific provisions of the collective bargaining agreement, whereas here requiring the use of ETD's violated no specific provision of the National Agreement.

A review of the cases cited by CSXT on appeal demonstrates that the district court's interpretation of the cases cited in the lower court is sound. All of the cases cited by CSXT involve interpretations of collective bargaining agreements that flouted specific, explicit terms. *See International Ass'n of Machinists & Aerospace Workers, Dist. 154, Local Lodge No. 2770 v. Lourdes Hosp. Inc.*, 958 F.2d 154, 157 (6th Cir.1992) (arbitrator's finding in "direct contradiction" with the terms of the agreement); *Polk Bros. Inc. v. Chicago Truck Drivers, etc.*, 973 F.2d 593, 597 (7th Cir.1992) (provisions "expressly bar" arbitrator's power to award reinstatement beyond termination dates of collective bargaining agreements); *Cement Div., Nat.*

*Gypsum Co. (Huron) v. United Steelworkers of America, etc., Local 135,* 793 F.2d 759, 767 (6th Cir.1986) (arbitrator disregarded "express terms" in relying on his own notion of fairness in making his interpretation); *see also Williams v. Chicago & N.W. Transp. Co.,* 715 F.Supp. 857 (N.D.Ill.1989) (award set aside because Board did not confine itself to matters within the scope of its jurisdiction by considering evidence which was not properly before the Board).

While there was no explicit language preventing the requirement of the use of ETD's on cabooseless trains, its absence does not end the inquiry as to whether the Board exceeded its authority in relying on the testimony of Shuler and others. At bottom, and as the district court found, the absence of explicit language as to ETD's is explained by Shuler's stipulation that they would be provided. Having stipulated in that manner, there was no need for the Edwards Board to concern itself with the question.

■ The Marx Board did not exceed its jurisdiction in considering the testimony leading to the interest arbitration award. Appeal to sources other than the explicit language of the bargaining agreement is legitimate, so long as the Board's award is derived from the essence of that agreement. " 'In construing any contract, including a collective bargaining agreement, determining the intent of the parties is the essential inquiry.' " *Local 1199, Hospital & Health Care Employees Union, etc. v. Brooks Drug Co.,* 956 F.2d 22, 25 (2d Cir.1992) (quoting *Loveless v. Eastern Air Lines, Inc.,* 681 F.2d 1272, 1279 (11th Cir.1982)). An arbitrator may "look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement." *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). If the parties' written agreement is ambiguous or silent regarding the parties' intent, the arbitrator may use past practices and bargaining history to "fill

a gap" in the written contract. *Manville Forest Products Corporation v. United Paperworkers International Union,* 831 F.2d 72, 76 (5th Cir.1987). The question now becomes whether the Marx Board in fact derived its decision from the essence of the Agreement as considered by the Edwards Board.

The Marx Board found, agreeing with CSXT, that "the Agreement and Award, sanctioning the operation of trains without cabooses, include no specific requirement for the use of [ETD's] in the absence of the cabooses." However, the Board did not stop there. The Board relied on the transcript and written submissions that formed the basis for the Edwards Award, to determine the intent of the parties.

■ We find that CSXT's characterization of the Board's reliance on those sources of information as outside the essence of the bargaining agreement virtually identical to the argument rejected by the Fifth Circuit in *Manville, supra.* There the employer contended that "because the 1983 contract makes no reference to a broke hustler for machine No. 1, the arbitrator could not have based his decision that such a position existed on the 'essence' of the agreement." *Manville,* 831 F.2d at 74. More specifically, Manville argued that because the arbitrator relied upon the 1982 to 1983 negotiations, "the arbitrator attempted to dispense 'his own brand of industrial justice.' " *Id.* The Fifth Circuit rejected the company's argument. In short, *Manville* and the cases cited therein "clearly support using ... negotiating history to resolve ambiguities and gaps in written collective bargaining agreements." *Id.* at 76; *see also Ladish Co. v. International Association of Machinists & Aerospace Workers, Dist. No. 10,* 966 F.2d 250, 253 (7th Cir.1992) (arbitrator that "thoroughly considered the evidence and arguments of both parties, paying particular attention to the negotiating history of the Company and the Union that resulted in the present dispute" did not display a manifest disregard of the agreement).[3]

---

**3.** CSXT seeks to distinguish *Manville* on the theory that in that case the employer had argued that because the bargaining agreement was silent concerning a certain job position, the arbitrator

could not order the company to fill that position. In making that claim, however, the employer ignored the parties' past practice that once a job position was created, it continued to exist unless

Similarly, in *Loveless v. Eastern Air Lines, Inc.*, 681 F.2d 1272 (11th Cir.1982), the Eleventh Circuit upheld an arbitration award in which the arbitrator went behind the contract language to hold that the plain language of the contract did not reflect the intent of the parties to the collective bargaining agreement. *Id.* at 1274, 1278. In that case, the pilot appellees argued that the arbitration award did not draw its essence from the agreement because the arbitration award did not adhere to the facially unambiguous language of the collective bargaining agreement. In examining the appellees' argument, the court cautioned that an arbitrator dispenses his own brand of industrial justice when "the arbitrator decides a matter according to a standard that reflects neither the language of the collective bargaining agreement nor the intent of the parties as embodied in the agreement." *Id.* at 1279. The court noted that the appellees were faulting the arbitrators "for taking the original intent of the parties so seriously that they went behind ostensibly unambiguous language in the contract to determine precisely what the original intent was." *Id.* (footnote omitted). The court concluded that such an award does not fail to draw its essence from the collective bargaining agreement.

In the present case, the UTU introduced evidence that clarified *why* the Edwards Award does not explicitly state that ETD's are required on cabooseless trains. In other words, the UTU presented evidence showing that it was unnecessary for Arbitrator Edwards to discuss the ETD requirement in his decision, namely because CSXT voluntarily agreed to it. To support that contention, the UTU presented evidence showing that as a result of CSXT's stipulation, the focus of the ETD discussion both at the hearing and in the prehearing submissions, was on which employees would handle the ETD's and whether they would be paid additionally for that work. Specifically, the transcripts re-

flect that on June 14, Shuler testified, stating:

> Now, as I said, we are developing a rear end device to comply with the FRA regulations, or any other state statute that might be applicable, and we, from a practical standpoint, certainly will use crafts other than trainmen to place this device on the rear of a cabooseless train in our major yards and terminals, where such employees happen to be on duty and they are available to place it.

Later that same day, Shuler testified:

> We all know that the rear end device is something that not only the Chessie, but other railroads will have to develop in order to comply with FRA regulations.
>
> . . . .
>
> Now, the question here—really what you're asking Mr. Edwards to rule on—as I understand your question, is can he grant you an arbitrary for handling this device? That's what your real issue is.

And, Shuler continued:

> It's just unfortunate, maybe from your standpoint, that your timing is such that you cannot properly demand or ask this neutral—or arbitrator—to grant you a share of the savings for handling the rear end device. I'm not denying that the rear end device must be developed, must be on the rear end of these trains. But you can't under the agreement that was negotiated, obtain an arbitrary unless by agreement.

When combined with the Shuler stipulation, the Marx Board's conclusion that there was no need for Arbitrator Edwards to decide the issue is plausible. Had the Arbitrator not considered the requirement of ETD's resolved, there would have been no reason to focus the attention on who would be responsible for attaching the device to the trains.

Finally, CSXT has argued that if the Edwards Board intended to require the operation of cabooseless trains on the use of

---

and until it was abolished by mutual agreement. "Here," writes CSXT, "there is no conflict or ambiguity concerning the Edwards Award, which clearly does not require the use of ETD's on all cabooseless trains."

In so arguing, CSXT seeks to assume the answer it desires. Just as there was a past practice in *Manville* that created ambiguity, so there was testimony at arbitration that created ambiguity as to whether a stipulation as to ETD's was being made.

ETD's, it would have at least noted that stipulation or referenced it somewhere in the Award. The UTU has asserted that the Edwards Award implicitly recognized CSXT's stipulation by the following statement:

> (c) During these proceedings there was considerable discussion pertaining to whether or not trainmen/yardmen should be required to perform the rear end device function. This document does not contain an exhaustive schedule of the tasks and duties performed by the several classifications of employees represented by the United Transportation Union. Therefore, under authority of Section 2, it is the Arbitrator's finding that this document shall not be construed as to be indicative that the performance of the rear end device function is or is not a legitimate duty requirement of trainmen/yardmen employees. Disputes arising over this issue shall be resolved in accordance with procedures under the Railway Labor Act, as amended.

Again, the statement presumes the existence of ETD's on cabooseless trains. Since, as both parties acknowledge, the issue of whether or not ETD's would be required on cabooseless trains was not presented during the arbitration proceedings, the presumption must be based on Shuler's stipulation.

In sum, there is sufficient evidence beyond the four corners of the Collective Bargaining Agreement to conclude that the intent of the parties was to include in its negotiations the question of the requirement of ETD's. Therefore, we find that in reaching the issue, the Marx Board did not exceed its jurisdiction. Rather, in its review of the Agreement and the Edwards Board's proceedings, it interpreted the essence of the collective bargaining agreement.

## C

■ Having found that the silence of the Edwards Award on the ETD's question was caused by the stipulation into which WM had entered during the course of the proceedings leading to that award, the district court then turned to the question of whether the interpretation itself was sustainable.

In beginning our inquiry, it is well to remember the narrow standard of review to be applied. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. at 38, 108 S.Ct. at 371. Thus, we may overturn the Board's interpretation of the contract only if it is " 'wholly baseless and completely without reason.' " *Norfolk & Western Ry. v. Transp. Com. Intern. Un.*, 17 F.3d at 700 (quoting *Gunther v. San Diego & Arizona E. Ry.*, 382 U.S. 257, 261, 86 S.Ct. 368, 371, 15 L.Ed.2d 308 (1965)).

Applying this narrow standard of review, we find that the district court did not err in affirming the Marx Board's interpretation of the Edward's arbitration award. Shuler's stipulation was followed near the end of the proceedings by the statement of UTU Vice President N.G. Jenkins, who testified in the following manner.

> It is extremely important to note in summary that too much emphasis cannot be placed on the performance of rear-end device function. The device is recognized by the parties as essential to the operation of trains without cabooses.

The district court noted that Jenkins' statement was unrebutted.

CSXT has asserted that nothing in Shuler's remarks could be construed as a promise or assurance that ETD's would be used on *all* cabooseless trains operated pursuant to the Edwards Award. Instead, CSXT has maintained, he was stipulating only to the use of such devices "where required, to conform with FRA or other regulations." Since FRA regulations did not, at the time the statement was made, require such ETD's, CSXT asserts that Shuler was not making a universal commitment. CSXT contends that "Shuler's statement and reference to the future use of ETD's was offered only as a general promise to comply with any subsequent amendments to the FRA regulations, which all the parties to the Edwards Arbitration knew would first have to occur before carriers would be permitted to use ETD's."

We agree that CSXT's interpretation of Shuler's stipulation is plausible. However, the UTU and Marx Board's interpretation certainly cannot be described as "wholly baseless and completely without reason." Indeed, the district court supplied a compelling reason in support of the Marx Board's interpretation. The district court reasoned that were CSXT's interpretation the correct one, Shuler would have been guilty of making an essentially empty promise. The argument that Shuler promised only that ETD's would be used to comply with FRA or other regulations "places CSXT in a somewhat unenviable position since CSXT further contends that ETD's are never required under the FRA or applicable regulations. If what CSXT now asserts is true, Shuler must have intended to mislead the Edwards panel by making an empty promise to it."

Finding that the Marx Board was not required to draw that conclusion, the district court determined that it was entirely reasonable for the Board to infer that Shuler in good faith was simply stating that WM would use ETD's and ensure that it was in regulatory compliance. The district court found, therefore, that "it was reasonable for the Board to infer that WM intended to use the ETD generally, not merely where technically required to do so by the FRA."

Whether reasonable or not, the Marx Board's interpretation was not wholly baseless. The basis for this characterization becomes even more apparent when one considers Jenkins' statement that the parties had agreed that ETD's were essential to the operation of cabooseless trains. There is no doubt that CSXT's interpretation is plausible, but it is not the only interpretation available. Under those circumstances, we must affirm the interpretation given to the statement by the Marx Board.

### III

■ Under *Norfolk Shipbuilding and Drydock Corp. v. International Brotherhood of Boilermakers, etc.,* 671 F.2d 797 (4th Cir. 1982), clear evidence of past practice and "common law of the industry" must be considered by the arbitrator. *Id.* at 800. CSXT complains that the Marx Board failed to consider affidavits it introduced tending to show that the carrier had a history of operating cabooseless trains.

■ The district court rejected CSXT's argument on two grounds. First, it found that the "past practice" could not have been one of significant duration, since ETD's are a relatively recent technological development. More important, it noted that CSXT introduced no documentary evidence (which would have been available to it) establishing the existence of the practice. Instead, CSXT merely presented the oral testimony of two witness to the effect that prior to February 1988 CSXT "had an uncontested practice of operating trains referenced in the Edwards Award without cabooses or ETD devices on the rear of the trains" and that "some 15 percent of the carrier's trains operated without cabooses or ETD devices on the rear of the trains." The district court found that the conclusory statements were contested by the UTU, and the Board was not required either to give credence to them or to address them specifically in its decision.

CSXT provides no persuasive argument for reversing the district court's ruling, instead merely reiterating the contents of the affidavits and attacking the documentary evidence supplied by the UTU. Its citation to *Norfolk Shipbuilding* is inapposite, since in that case the district court refused to admit evidence of industry custom. 671 F.2d at 799. Here, the Board admitted the evidence, and there is nothing to suggest that the Board failed to consider it. Not only were the affidavits arguably contradicted by the UTU documentary evidence, but CSXT could have provided documentary evidence which it did not.

### IV

Accordingly, the judgment of the district court is

*AFFIRMED.*