The **CORPORATE PRINTING COMPANY, INC.,**
Plaintiff(s),

v.

**NEW YORK TYPOGRAPHICAL UNION NO. 6, Defendant(s).**

No. 93 Civ. 6796 (SS).

United States District Court,
S.D. New York.

Feb. 1, 1995.

342

Rains & Pogrebin, P.C., Frederick D. Braid, Mineola, NY, for plaintiff.

Vladeck, Waldman, Elias & Engelhard, P.C., Daniel Engelstein, New York City, for defendant.

## ORDER AND OPINION

SOTOMAYOR, District Judge.

By Opinion and Order dated July 14, 1994 (the "Opinion"), I confirmed an Opinion and Interim Arbitration Award dated July 1, 1993 of Impartial Arbitrator John E. Sands (the "Award") in favor of Respondent, New York Typographical Union No. 6 (the "Union"). *The Corporate Printing Company, Inc. v. New York Typographical Union,* 1994 WL 376093 (S.D.N.Y. July 14, 1994) (hereinafter, the "Opinion"). In the Opinion, I stated that the baseless nature of Petitioner Corporate Printing Company, Inc.'s ("CPC") challenge to the Award appeared to warrant the imposition of sanctions. *Id.* at *17–19. I reserved decision on the question of sanctions, however, pending further briefing and an accounting by Respondent of its attorneys fees and costs. *Id.* at *19–20. I held oral argument on the sanctions question generally and in particular on the question of against whom sanctions should be imposed, i.e., CPC, the firm retained to represent it, or the attorney who signed the pleadings at issue.

Petitioner CPC and its attorneys now move for reconsideration of my decision confirming the Award, and urge me not to impose sanctions. In the alternative, CPC and its attorneys ask that I limit sanctions to a verbal reprimand.

For the reasons discussed below, Petitioner's motion to reconsider the confirmation of the Award is denied. Respondent's motion for sanctions against counsel who signed the pleadings in this action is granted, but Respondent's request that I retain jurisdiction over the parties future conduct is denied as moot.

## BACKGROUND

Familiarity with the Opinion is presumed and the following is only a brief recitation of those facts relevant to the matter before me.

The Printer's League, which at the time included CPC, and the Union entered into a collective bargaining agreement effective October 4, 1975 (the "1975 Agreement"). The 1975 Agreement was scheduled to terminate in October 1985, but was modified in 1983. CPC was the sole printer-employer who did not join the 1983 accord.

The disagreement relevant to the instant action concerns CPC's wage and benefits obligations under the 1975 Agreement, in light of CPC's withdrawal from the Printers League in 1977, and CPC's subsequent refusal to adopt the 1983 modification. The sections of the 1975 Agreement at issue are referred to as the "Special Agreement." The Special Agreement ensured "income" and other benefits for certain named employees (the "guaranteed employees") so long as those employees remained members of the bargaining unit. In 1986, however, CPC unilaterally changed the wages and benefits of the guaranteed employees.

CPC and the Union have been involved in litigation and arbitration spanning several years, during which time CPC has vigorously contested its responsibilities under the 1975 Agreement. A fuller description of this history is contained in the Opinion. *Id.* at *1–3, *7–8. Following completion of the arbitration, the Award was issued in favor of the Union. In the Award, Arbitrator Sands

found that the income guarantee in the Special Agreement was clear and unambiguous, and that the income guarantee survived the original 1985 expiration date of the 1975 Agreement and that CPC's unilateral changes in wages and benefits in 1986 violated the Special Agreement. The Award at 22–24, Exhibit A to the Verified Petition to Vacate Arbitration Award (hereinafter "Petition at Ex. A").

In confirming Arbitrator Sands's Award, I rejected CPC's claims that the Award violated public policy, or that the Award did not draw its essence from the collective bargaining agreement. Opinion at *13–17. Moreover, I found that CPC's arguments in support of its Petition to Vacate the Award were meritless and the Petition was brought in bad faith, thereby warranting sanctions. *Id.* at *17–19. Subsequent to the Opinion, the parties stipulated to the sum of $20,000 as the measure of reasonable attorneys' fees incurred by the Union in opposing Petitioner's Petition to Vacate the Award. Respondent's Memorandum In Support of Costs, p. 2 n. 1. The stipulation was made without prejudice to CPC's claim that sanctions against it or its attorneys are unwarranted.

### *DISCUSSION*

### The Scope of Sanctions

■ Generally, sanctions are permissible under Rule 11 of the Federal Rules of Civil Procedure ("Rule 11"), 28 U.S.C. § 1927 ("§ 1927"), and the court's "inherent power". *See U.S. v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO,* 948 F.2d 1338, 1344 (2d Cir.1991); *see also Oliveri v. Thompson,* 803 F.2d 1265 (2d Cir.1986), *cert. denied sub nom. Suffolk County v. Graseck,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). Although these three sources for sanctions apply different standards, all turn on a finding that a party has abused the judicial system.

■ Under the "inherent power" doctrine, attorneys' fees can be imposed when the losing party has continued an action "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Oliveri,* 803 F.2d at 1272 (citations omitted). Similarly, § 1927 permits the imposition of sanctions upon any person who unreasonably multiplies proceedings. *Id.* at 1273. The "inherent power" doctrine and § 1927 both require a showing of "bad faith". *Int'l Brotherhood of Teamsters,* 948 F.2d at 1345. Prior to its amendment in 1993 (hereinafter "old Rule 11")[1], Rule 11 permitted sanctions to be imposed upon the signor of a pleading that was either interposed in bad faith or frivolously. *Oliveri,* 803 F.2d at 1275.

■ Whether conduct should be sanctioned is measured by the standard in effect at the time of the conduct to be sanctioned. *Knipe v. Skinner,* 19 F.3d 72 (2d Cir.1994); *First Interregional Equity Corporation v. Haughton,* 1994 WL 364038 (S.D.N.Y. July 13, 1994); *Kraemer Export Corporation v. Peg Perego U.S.A., Inc.,* 1994 WL 86357 (S.D.N.Y. March 17, 1994). Because the conduct in question here occurred prior to Rule 11's 1993 amendment, old Rule 11 applies. Nevertheless, even if a violation of old Rule 11 has occurred, the mandatory application of sanctions is no longer required because the Second Circuit has recognized the right of district courts to apply the discretion permitted under the 1993 amendment of Rule 11. *Knipe,* 19 F.3d at 75, 78 (under pre-amendment Rule 11 the imposition of sanctions was mandatory "upon finding a violation of the Rule", but district court should be "afforded an opportunity to exercise its discretion" as permitted by new Rule 11); *First Interregional* at *4 (same).

■ Old Rule 11 required the imposition of sanctions "where it is clear that: (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been

---

1. Prior to its amendment, Rule 11 provided in pertinent part:

 The signature of an attorney or party constitutes ... that to the best of the signer's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose. . . .

advanced to extend, modify or reverse the law as it stands.". *Int'l Shipping Co. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir.), *cert. denied sub nom. Golub v. Hydra Offshore, Inc.*, 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). In addition, counsel who interposed a signed paper for an improper purpose violated his or her duty to the court, and was thereby subject to sanctions. *Id.*

■ No finding of subjective bad faith was required to support Rule 11 sanctions against the party that signs a pleading. *Int'l Brotherhood of Teamsters*, 948 F.2d at 1344 (citing *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991)); *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1288 (2d Cir.1986) (discussing how objective inquiry required under old Rule 11 did not necessitate finding bad faith); *Oliveri*, 803 F.2d at 1275 ("there is no necessary subjective component to a proper Rule 11 analysis"); *Eastway Constr. Corp. v. City of New York* ("Eastway I"), 762 F.2d 243, 254 (2d Cir. 1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) (showing of subjective bad faith not required to trigger Rule 11 sanctions). Rather, bad faith (via an "improper purpose") was a separate ground for sanctions, requiring a separate analysis.

Thus, sanctions under the old Rule 11 can be imposed upon the attorney who signs a pleading, and does not require an inquiry into the signor's subjective good faith. *Int'l Shipping*, 875 F.2d at 390–91 (affirming Rule 11 sanctions for failure to perform a "reasonable inquiry into the applicable law prior to signing the complaint"); *Grosvenor Mktg. Ltd.*, 803 F.2d at 1288 (affirming Rule 11 sanctions where no chance of success under existing precedents existed, and no reasonable argument was advanced to extend, modify or reverse the law as it stood).

■ It must be noted that the Second Circuit has maintained that a finding of bad faith must be made for the imposition of sanctions against represented parties who file frivolous pleadings, presumably on the premise that a represented party relies on the advise of counsel in determining the legal viability of an action. *See Int'l Brotherhood of Teamsters*, 948 F.2d at 1346 (vacating sanctions against client because characterization of tactics as "dilatory" and "abusive" was insufficient to demonstrate bad faith absent an unambiguous connection to the signed instrument).

■ Moreover, under the old Rule 11, sanctions for the signing of frivolous motions, pleadings or other papers can be imposed only against the individual attorney who signed the paper subject to sanctions, rather than against the attorney's law firm. *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 124, 110 S.Ct. 456, 459, 107 L.Ed.2d 438 (1989) ("[j]ust as the requirement of signature is imposed upon the individual, we think the recited import and consequences of signature run as to him.").

Under the standards controlling old Rule 11, I find that the Verified Petition to Vacate Arbitration Award (the "Petition"), the Brief in Support of the Corporate Printing Company, Inc.'s Petition to Vacate an Arbitration Award (the "Brief"), and Petitioner's Reply Brief in Support of the Petition to Vacate an Arbitration Award (the "Reply Brief"), as signed and interposed by Frederick D. Braid, counsel to Petitioner, are sufficiently frivolous to justify sanctions against counsel. However, I elect not to impose sanctions upon CPC because I find insufficient proof that it knew or should have known of the frivolous nature of its counsel's arguments.

### The Frivolous Petition and Brief

The central argument in Mr. Braid's Petition, Brief, and Reply Brief was that Petitioner in the Special Agreement had not clearly waived its right to bargain over and thereby lower the wages and benefits of all employees, including the guaranteed employees, after the expiration of the collective bargaining agreement. Mr. Braid claimed that the right to bargain wages after the expiration of the collective bargaining agreement could not be vitiated absent a "clear and unmistakable waiver" of that right because public policy favored collective bargaining at fixed intervals. Petitioner's Brief at 20–22. Moreover, Mr. Braid argued that only a court, not an arbitrator, could determine whether a waiver of the right to bargain

existed in a collective bargaining agreement. Reply Brief at 4.

 Rule 11 sanctions are appropriate against Mr. Braid because it was not reasonable for him to believe that under existing law there was a chance of success for his arguments or that he had, on the facts of the dispute, a reasonable argument to extend, modify or reverse the Award under the law as it stood. I have no quarrel with the general principles that Mr. Braid championed. However, Mr. Braid's papers discussed broad policy issues that were inapplicable to the circumstances of his case. Mr. Braid did not have good faith arguments premised upon existing facts in the record to support his arguments, and Mr. Braid's Petition, Brief, and Reply Brief were plainly frivolous and subject to sanctions.

As noted, Mr. Braid argued that Arbitrator Sands's interpretation of the Special Agreement frustrated CPC's public policy right to bargain and therefore unilaterally lower wages once the collective bargaining agreement terminated. Petition at 9; Petitioner's Brief at 15–19. To support his argument, Mr. Braid maintained that no explicit or clear waiver of the right to bargain wages was found in the Special Agreement and therefore the arbitrator fundamentally erred in interpreting the Agreement in a manner that ignored the termination date of the collective bargaining agreement.

It is impossible to understand Mr. Braid's argument in light of the unambiguous and clear terms of the Special Agreement. Arbitrator Sands pointed to six different places in the Special Agreement where it explicitly noted that the income obligations it imposed survived the termination of the collective bargaining agreement. Award at 6–9, Petition at Ex. A. Moreover, the "evergreen" clause of the Special Agreement states:

This Contract, unless otherwise terminated or modified under the options contained in this Section, shall be in effect until midnight October 3, 1985. Sixty days prior to that date either party may give the other party notice of desire to change the terms thereof. Negotiations shall be immediately entered into and proceed with all due diligence. **If an agreement has not been reached by midnight October 3, 1985, conditions prevailing prior to midnight October 3, 1985 shall be maintained until an agreement is reached or other action is authorized by New York Typographical Union No, 6 or the League.**

Award at 6, Petition at Ex. A (emphasis added).

Thus, the Agreement explicitly said what Mr. Braid argued it did not, i.e., it bound employers to the wages at the termination of the Agreement *until* the parties *both* agreed to a change. The Special Agreement clearly established a definite termination date for its obligations in the absence of an agreement to the contrary, i.e., membership of the last *named* employee in the bargaining unit. Therefore, Mr. Braid's arguments that the Special Agreement's income guarantee terminated at the end of the collective bargaining agreement or that the Special Agreement's indefiniteness violated public policy favoring collective bargaining were specious. Opinion at *5.

 Moreover, Mr. Braid in proffering his arguments mischaracterized the essence of public policy under the National Labor Relations Act, 29 U.S.C. § 151 ("NLRA"). Petitioner's Brief at 15–17; *see* Opinion at *14–15. Public policy, as reflected in the NLRA, does not disfavor the entry of long-term or fixed obligations under a collective bargaining agreement, but instead bars negotiation of specific terms once an agreement is reached. *See id.* Mr. Braid maintained at oral argument that existing cases upholding lifetime job guarantees were distinguishable from the lifetime wage guarantee in this case because a prohibition against bargaining wages implicated the essence of collective bargaining and therefore a broader public policy question. The distinction Mr. Braid made was substantively meaningless. Guaranteeing a lifetime job implicates by necessity a lifetime income. There is no reason at law why a waiver of the right unilaterally to change wages has to be any more explicit than a waiver of the right to fire employees.

In further support of his public policy argument, Mr. Braid maintained that Petitioner's right to set wages and benefits after the

1985 expiration of the collective bargaining agreement could not be vitiated absent a "clear and unmistakable" waiver and that the Special Agreement was sufficiently ambiguous to make this an issue for the court to decide. Petitioner's Brief at 19–35. In the Opinion, I found that the waiver Petitioner would require was indeed satisfied by the clear language of the Special Agreement and that no reasonable attorney could in good faith argue otherwise. Opinion at *15–16. The ambiguity Mr. Braid championed simply did not exist. Although the legal principle is potentially arguable in some circumstances that a court instead of an arbitrator should decide the issue of a waiver of bargaining, the Special Agreement was sufficiently clear to make such an argument in this case frivolous. *Id.* at *4–7.

■■■■ In any event, the law is abundantly clear that it is within the power of an arbitrator to interpret the meaning of the terms of a contract. Judicial review of an arbitrator's award is strictly limited. *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 37, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987); *Local 1199, Hospital & Health Care Employees Union, etc. v. Brooks Drug Co.,* 956 F.2d 22, 24 (2d Cir.1992). A court's review is:

> confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was [the arbitrator's] judgment and all that it connotes that was bargained for.

*United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960).

■■■ A "barely colorable justification for the outcome reached" by the arbitrator is sufficient for an award to withstand challenge. *Meyers v. Parex, Inc.,* 689 F.2d 17, 19 (2d Cir.1982) (quoting *Andros Compania Maritima, S.A. v. Marc Rich & Co.,* 579 F.2d 691, 704 (2d Cir.1978)). So long as the arbitrator arguably construes or applies the con-

tract and acts within his or her authority, the award cannot be vacated because a court disagrees with the factual findings or the interpretation of the contract. *Misco,* 484 U.S. at 36–37, 108 S.Ct. at 369–70; *Radio & Television Broadcast Eng'rs Union, Local 1212 v. WPIX, Inc.,* 716 F.Supp. 777, 780 (S.D.N.Y.1989), *aff'd,* 895 F.2d 1411 (2d Cir. 1989). Specifically, the Supreme Court has cautioned that while an arbitrator cannot ignore the plain language of a contract, "the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract." *Misco,* 484 U.S. at 38, 108 S.Ct. at 371.

To the extent that any ambiguity could arguably have existed as to what the Special Agreement meant when it specifically guaranteed "income" after the termination of the collective bargaining agreement, that issue was one for the arbitrator and no reasonable argument existed that a court was empowered to or could alter the conclusions of the arbitrator on this issue.

For the same reasons as discussed with respect to the waiver argument, Mr. Braid's final argument that the Award failed to draw its essence from the Special Agreement because Arbitrator Sands exceeded his authority by ignoring the October 1985 expiration date of the collective bargaining agreement was equally baseless. Petition at 9; Petitioner's Brief at 36–40. The Arbitrator, on the face of the Award, rendered his decision on the clear terms of the Special Agreement that the "income" guarantees of the Agreement survived the expiration of the collective bargaining agreement. It defies any sense for Mr. Braid to have argued that the arbitrator's decision fixing the guaranteed income at a specific amount mentioned in the Agreement at a fixed time somehow exceeded the essence of the contract.

In short, the pleadings presented by Mr. Braid to support Petitioner's motion to vacate the arbitration award were frivolous, meritless and baseless in law and in fact.

## Mr. Braid's Conduct in Delaying the Arbitration Process

 A sanctionable "improper purpose" is found where counsel has acted to delay or needlessly increase litigation. *Caisse Nationale De Credit Agricole–CNCA, New York Branch v. Valcorp, Inc.*, 28 F.3d 259, 264 (2d Cir.1994). Interposing any claim for any improper purpose violates the attorney's duty to the court, and is therefore sanctionable. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990).

By demanding that the arbitration hearing on damages be stayed pending the court's decision on the Petition to Vacate the Liability Award, Mr. Braid needlessly caused at least a one-year delay in the completion of the arbitration.[2] This delay compounded a decade of delays regarding the underlying dispute generally, and a three-year delay to the arbitral process specifically. Although I find that Respondent contributed to some of the delays in the arbitration process, the Union's contributory delays pale in comparison to the delays created by CPC's questionable objections and challenges during the arbitration process.[3]

At oral argument on the issue of sanctions, Mr. Braid conceded that Arbitrator Sands had full authority, and a basis within the explicit terms of the Special Agreement, to determine the meaning of "income guarantees" as applied to the "guaranteed employees." Mr. Braid explained that he challenged the Award in the Petition because he believed that the Arbitrator had failed to draw his decision from the essence of the collective bargaining agreement in extending the income guarantee to all employees instead of merely to guaranteed employees. Mr. Braid drew this conclusion from the Respondent's arguments to the arbitrator following the Award that the Award meant that all employees were covered by the income guarantees. Mr. Braid claimed that only in Respondent's opposition papers to the Petition did it concede that the Award and its holding applied only to guaranteed employees.

I find Mr. Braid's explanation of why he filed the Petition hard to understand. Respondent's interpretation of the Award is not binding on anyone and the arbitrator had never adopted or endorsed Respondent's interpretation. In fact, the Award, in no less

**2.** A condensed history of this protracted dispute follows:

1983—Respondent seeks and petitioner resists declaratory arbitration as to scope of the Special Agreement provision. Union claims that CPC intends not to be bound by Special Agreement after its 1985 expiration.

10/85—The Rains firm introduces claim of arbitral bias arising from the choice of arbitrator by Union and the Printer's League. However, their choice is provided for in the collective bargaining agreement. Although arbitration continues, this dispute sets the stage for later delays arising from the arbitration fees and claims against conduct of the arbitrator (which claims ultimately fail).

1/86—Petitioner breaches Special Agreement, although issue as to whether the Special Agreement survives expiration of the Agreement is still under consideration by the arbitrator.

11/87—The Rains firm refuses to pay arbitrator's fees, after 9 days of hearings and one year after first bill submitted. This results in suspension of hearings by arbitrator and delay of three years, while petitioner pursues bias claim.

10/90—Bias claim fails in federal court (*see* Grottola Affidavit, sworn to September 1, 1994 Aff. at Ex. 5) having previously failed in state court (*see id.* at Ex.G). Arbitration compelled.

New arbitrator appointed, to which petitioner agrees.

7/93—Arbitration completed. Mr. Braid brings the petition to vacate the Interim Arbitration Award, which takes until September 9, 1994 to fully submit.

3/94—Rains requests discovery material for the claimed purpose of expediting the damages portion of the dispute pending my decision regarding Petitioner's vacatur motion.

7/94—Arbitration award confirmed. The Rains firm moves for reconsideration.

9/94—Respondent challenges Rains's discovery as "duplicative and largely irrelevant".

**3.** For example, Mr. Braid objected to paying arbitrator's fees based upon a groundless argument that such fees were contractually assigned to the Union via an arbitration fund. However, that fund was never implemented and therefore did not exist. Moreover, even if it had been implemented, CPC never contributed to it, thereby eliminating any inclusion in it, or the fund's liability for the entirety of the arbitration fees. CPC's refusal to pay its share of the arbitration fees, combined with their related argument of arbitral bias, resulted in a three-year suspension of the arbitration.

than a dozen places, emphasized that it addressed "guaranteed employees". Petition at Ex. A. Nowhere in the Award are non-guaranteed employees mentioned. In any event, as I was informed at oral argument, there were only three potentially non-guaranteed employees at issue in the dispute between the parties. To have delayed the arbitral process with respect to the amounts owed to the many other guaranteed employees because of a questionable interpretation of an Interim Award as it might have effected three employees comes very close to bad faith. This is particularly true when Petitioner had the right to challenge the final award and its application to the three non-guaranteed employees if the arbitrator had erroneously included this group in his damage award.

**The Form of Sanctions**

██ Sanctions are justified under Rule 11 to prevent future occurrence of baseless pleadings and to cure the injury arising from frivolous motions. *See Cooter & Gell,* 496 U.S. at 393, 110 S.Ct. at 2454; *see also Eastway Constr. Corp. v. City of New York* ("Eastway II"), 821 F.2d 121, 125 (2d Cir. 1987), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) (Pratt, J., dissenting) (enumerating additional grounds for sanctions beyond judicial efficiency). Shortly after I issued the Opinion and held oral argument on the issue of sanctions, the parties met with Arbitrator Sands and consensually converted the arbitration hearings on damages into mediation. That mediation process resulted in a Stipulation and Order of Dismissal of the Petition and its pending appeal (with a reservation of the pending sanctions motion) as well as the entry of a Final Consent Award. Thus, the eleven year battle between the parties about the 1975 Agreement appears to have come to an end. As Mr. Braid noted during oral argument on the sanctions motion and which I recognize, the collective bargaining agreement between the parties in this case was unusual and addressed conditions and events in the marketplace in a way that had never previously occurred. In light of the recent settlement and the small likelihood that this situation will recur, the need to impose sanctions in order to deter future misconduct does not exist.

I also recognize, however, that the Union should not be liable for attorneys' fees and costs incurred because of a meritless Petition. Nevertheless, the Union consented to stay the damages hearing pending the Petition, and its concededly erroneous arguments on the nonguaranteed employees contributed to the bringing of the Petition.

██ Non-monetary sanctions are an alternative form of sanction available to the court. *See Anderson v. Cooper,* 1994 WL 46675 at *2 (N.D.Ill. Feb. 14, 1994). Cautionary imposition of sanctions is necessary to avoid chilling creative advocacy. Thus, calibrating the severity of sanctions to the level of bad faith demonstrated by the party against whom sanctions are contemplated, is essential. *See Cross & Cross Properties v. Everett Allied Co.,* 886 F.2d 497, 504 (2d Cir.1989); *see also Eastway II,* 821 F.2d at 122. Mr. Braid claims that non-monetary sanctions are sufficiently severe because they affect counsel's professional reputation. Although initially I was not predisposed into believing that Mr. Braid's conduct on behalf of his client during the lengthy life of this dispute was motivated by good faith and that non-monetary sanctions were appropriate, I became convinced after oral argument that Mr. Braid was an advocate caught up in a contentious litigation in which he lost prospective. In short, I do not find subjective bad faith on his part and believe that a reprimand, as contained in the findings in this Opinion and the Opinion's public nature, is sufficient to punish Mr. Braid's conduct.

Finally, Respondent's request that this Court continue jurisdiction over the parties' arbitration so as to compel compliance with the Award is denied as moot given the recent Stipulation of Dismissal of this action.

## *CONCLUSION*

For the reasons discussed above, the motion to reconsider my July 14, 1994 Order confirming Impartial Arbitrator Sands's arbitration award is denied. I find Mr. Braid's conduct subject to sanctions and reprimand

him for that conduct but do not award attorneys' fees or costs.

The Clerk of the Court is directed to enter judgement in accordance with this Opinion.

**SO ORDERED.**