**LOCAL 1199, DRUG, HOSPITAL AND HEALTH CARE EMPLOYEES UNION, RWDSU, AFL–CIO, Appellant,**

v.

**BROOKS DRUG COMPANY, Rite–Aid Corporation and Rock Bottom Stores, Inc., Appellees.**

No. 624, Docket 91–7760.

United States Court of Appeals, Second Circuit.

Argued Dec. 18, 1991.

Decided Feb. 3, 1992.

Daniel J. Ratner, New York City (Jeffrey G. Stein, and Eisner, Levy, Pollack & Ratner, on the brief), for appellant.

Stanley L. Goodman, New York City (Beth Schwartz Lyons, and Grotta, Glassman, & Hoffman, on the brief), for appellees.

Before TIMBERS, MESKILL and KEARSE, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant Local 1199, Drug, Hospital and Health Care Employees Union, RWDSU, AFL–CIO (the union) appeals from a judgment entered June 28, 1991, in the Southern District of New York, Lawrence M. McKenna, *District Judge,* confirming an arbitrator's award dated October 24, 1990, which suspended payments by appellees Brooks Drug Company, Rite–Aid Corporation and Rock Bottom Stores, Inc. (the employers) to a pension fund for a period of forty four and one half months.

The union contends that the arbitrator exceeded his authority in granting the arbitral award. Specifically, the union argues that the arbitrator did more than merely interpret the contract clause submitted to him; rather, he administered his own form of "industrial justice." The district court rejected appellant's contentions and con-

firmed the award. Appellant now appeals to this Court.

For the reasons that follow, we affirm.

**I.**

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

The employers are operators in the drug and beauty aid retail industry. They and the union are parties to a collective bargaining agreement that is comprised of the underlying contract effective from October 8, 1985 through October 8, 1988 (the 1985–88 agreement), as extended and modified by a Memorandum of Agreement effective from October 9, 1988 through October 5, 1991 (MOA).

The union also is a party to a collective bargaining agreement with the League of Voluntary Hospitals (the league), a multi-employer association of members that operate not-for-profit hospitals in the New York City and greater metropolitan area. Pursuant to their respective collective bargaining agreements with the union, the employers and the league are required to make contributions on behalf of their covered employees to the National Pension Fund for Hospital and Health Care Employees (the pension fund) and to the National Benefit Fund for Hospital and Health Care Employees (the benefit fund).

After several months of negotiations between the employers and the union, the MOA was signed on November 29, 1988. Its effective date was October 9, 1988; its expiration date was October 6, 1991. In the MOA, the employers agreed to continue contributing to the pension fund at a rate of 7% (of gross payroll), and agreed to increase their contributions to the benefit fund to 11.8% (of 95% of gross payroll) during the term of the MOA. The MOA further provided in Paragraph 4(D) (also known as the "Most Favored Nation Clause" (the MFN clause)), that:

"Should the Union negotiate a contract with the League of Voluntary Hospitals which provides a lower contribution rate

or a formula which would lower the contribution costs to the Employers for the 1199 Funds, the Employers shall be entitled to the same reduced contribution and/or the use of the reduced formula for *the same period."* (emphasis added).

On October 4, 1989 (subsequent to its signing of the MOA), the union reached a new collective bargaining agreement with the league (the league agreement). The league agreement provided for a suspension of employer contributions to the pension fund for the period July 1, 1989 to June 15, 1992 *due to a surplus in the pension fund.*

Following the union's contract settlement with the league, the employers attempted to reach an agreement with the union as to the meaning and application of the MFN clause in the MOA. This attempt was unsuccessful. On February 2, 1990, the matter was submitted to arbitration pursuant to Article 38 of the 1985–88 agreement. The following issues were designated for resolution by the arbitrator:

"(a) What is the appropriate interpretation of the Most Favored Nation clause in the collective bargaining agreement?

(b) What contributions, if any, pursuant to the Most Favored Nation clause of the collective bargaining agreement, are due and owing? *What are the effective dates for these contributions?"*

(emphasis added).

After due notice to the parties and a hearing held on July 14, 1990, the arbitrator issued his award on October 24, 1990. The arbitrator interpreted the MFN clause to require: (1) for the period from October 9, 1988 (the effective date of the MOA) to June 30, 1989 (the final day before the league agreement took effect), payments of 7% of gross payroll, but *"[b]ecause of the surplus in the Pension Fund and in accordance with the intention of the parties as expressed in Paragraph 4(C) of the Memorandum of Agreement ...,"* (emphasis added) such payments were to be redirected from the pension fund to the benefit fund. Payments already made to the pension fund during this period *"were not*

*authorized by the collective bargaining agreement* and as such they should either be transferred directly from the pension fund and utilized as a credit to the Benefit Fund or returned to the contributing Employer;"* (emphasis added) (2) for the period from July 1, 1989 to June 15, 1992 (the period of the league agreement, thirty five and one half months), "the Employers need not make any payments to the Pension Fund *because of a surplus in that fund"* (emphasis added); and (3) for the period from October 9, 1988 to October 5, 1991, 11.8% contributions to the benefit fund will remain in effect as negotiated in the MOA; for the period from October 6, 1991 to June 30, 1992, the employer's contribution to the benefit fund shall be increased to 14.33% of gross payroll.

The union petitioned the district court to vacate the arbitration award, alleging, pursuant to § 10 of the Federal Arbitration Act, that the arbitrator had exceeded his powers. The union based its petition on several specific allegations including, among others, that the arbitrator had exceeded his authority by ordering a suspension of pension contributions for a period nine months longer than that provided for in the league agreement.

The district court, finding that the issue presented to the arbitrator had been broadly framed, held that the arbitrator had not exceeded his authority in interpreting the MFN clause. The court therefore denied the union's petition and granted the employers' motion to confirm the arbitration award.

On appeal, the union renews its contention that the arbitrator exceeded his authority in suspending the employers' pension contributions for a period nine months longer than that provided for in the league agreement.

## II.

██ Our review of an arbitration award is quite limited. *Leed Architectural Products, Inc. v. United Steelworkers Local 6674*, 916 F.2d 63, 65 (2 Cir.1990) (citing *United Paperworkers Int'l Union v. Mis-*

*co, Inc.,* 484 U.S. 29, 36 (1987)). " '[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.' " *Misco, supra,* 484 U.S. at 38 (citation omitted). Rather, "[t]he court is forbidden to substitute its own interpretation even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong." *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.,* 935 F.2d 1501, 1505 (7 Cir.1991); *see also New York Typographical Union No. 6 v. Printers League Section of Ass'n of Graphic Arts,* 878 F.2d 56, 60 (2 Cir.1989). In other words, we must determine first whether the arbitrator acted within the scope of his authority, and second whether the award draws its essence from the agreement or is merely an example of the arbitrator's own brand of justice. *Misco, supra,* 484 U.S. 29; *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596 (1960); *Radio & Tel. Broadcast Engineers Union, Local, 1212 v. WPIX, Inc.,* 716 F.Supp. 777, 780 (S.D.N.Y.1989), *aff'd,* 895 F.2d 1411 (2 Cir. 1989).

■ "[T]he 'scope of authority of arbitrators generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission.' " *Synergy Gas Co. v. Sasso,* 853 F.2d 59, 63–64 (2 Cir.) (quoting *Ottley v. Schwartzberg,* 819 F.2d 373, 376 (2 Cir. 1987)), *cert. denied,* 488 U.S. 994 (1988). "Such an agreement or submission serves not only to define, but to circumscribe, the authority of arbitrators." *Ottley, supra,* 819 F.2d at 376 (citation omitted). If it is clear that the arbitrator has exceeded his authority, the award cannot stand. *See, e.g., Harry Hoffman Printing v. Graphic Communications International Union,* 950 F.2d 95 (2 Cir.1991); *Leed Architectural, supra,* 916 F.2d 63; *In re Marine Pollution Service, Inc.,* 857 F.2d 91 (2 Cir. 1988).

■ In the present case, as indicated above, the parties submitted to the arbitrator two questions, one of which was "What is the appropriate interpretation of the 'most favored nation' clause in the collective bargaining agreement?" The submission did not state that the arbitrator was to draw his interpretation solely from the language of that clause, and it was within his authority to seek guidance from other parts of the agreement as to what the parties intended in that clause.

■ As to whether the award draws its essence from the agreement, it is established that an arbitrator may "look for guidance from many sources, [and] his award is legitimate ... so long as it draws its essence from the collective bargaining agreement." *Enterprise Wheel, supra,* 363 U.S. at 597. "In construing any contract, including a collective bargaining agreement, determining the intent of the parties is the essential inquiry." *Loveless v. Eastern Air Lines, Inc.,* 681 F.2d 1272, 1279 (11 Cir.1982). Indeed, in interpreting a collective bargaining agreement, an arbitrator may not even be bound by the common law contract parol evidence rule. *Manville Forest Products Corp. v. United Paperworkers Int'l Union,* 831 F.2d 72, 75–76 (5 Cir.1987); *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Const. Co.,* 932 F.2d 1443, 1448 (11 Cir.1991) ("The interpretation of collective bargaining agreements is governed by federal law; however, traditional contract interpretation rules are applied if they are consistent with federal labor policies."); *WPIX, supra,* 716 F.Supp. at 781 ("It is well settled that the arbitrator may look beyond the terms of the agreement for guidance ... [and] may interpret the CBA *'in light of the parties' intent revealed through bargaining history,* past practices, rights established under earlier agreements, and other rudimentary sources of contract construction.' ") (emphasis added in part, deleted in part) (citations omitted)).

■ We acknowledge that an arbitrator "may not impose a remedy which directly contradicts the express language of the collective bargaining agreement." *Leed, supra,* 916 F.2d at 65 (quoting *Bruno's, Inc. v. United Food & Commercial Work-*

*ers Int'l Union, Local 1657*, 858 F.2d 1529, 1531 (11 Cir.1988)). *But see Loveless, supra,* 681 F.2d 1272 (permitting the use of extrinsic evidence to establish the intent of the parties, in direct conflict with language set forth in the collective bargaining agreement).

■ Our task is to determine whether the arbitrator interpreted an arguably ambiguous contractual provision in light of the intent of the parties, or merely administered his own brand of justice in contradiction of the clearly expressed language of the contract.

■ Here, the arbitrator determined that the employers were entitled to the reduced contribution formula for a forty four and one half month period beginning on the effective date of the MOA, October 9, 1988 (9 months prior to the effective date of the league agreement) and ending on the expiration date of the league agreement, June 15, 1992. The union contends that the arbitrator ignored the phrase "for the same period" at the end of the MFN clause, which it says limits the reduction in the employers contributions to the "same period" as that in effect during the period of the league agreement (thirty five and one half months).

Our task, however, is not to review the accuracy of the arbitrator's construction of the MFN clause. We need only determine whether he arguably was interpreting the MFN clause when he determined that the employers should be permitted to refrain from payments during the forty four and one half month period.

The district court held that "the question presented to the arbitrator here was broadly-framed, asking for a determination of both the contribution rates and the effective dates of the rates, pursuant to the Most Favored Nation clause." In view of the ambiguity in the clause itself and the broadly phrased submission, the arbitrator justifiably looked to other contract provisions, as well as extrinsic evidence, to determine the intent of the parties at the time the MOA was executed. Since he had this authority, the arbitrator was not administering his own brand of justice in looking at provisions other than the MFN clause in the MOA and considering factors outside of the collective bargaining agreement for guidance.

In interpreting the intent of the parties in enacting the MFN clause, the arbitrator apparently looked to another provision of the MOA, clause 4(c), which provides that:

"The Employers and the Union agree that on request by the Union, they will execute an agreement prospectively reducing the contribution rate to the Pension Fund and simultaneously increasing the contribution rate to the Benefit Fund. The total amount of contributions redirected to the Benefit Fund shall be the same amount as the reduction in contribution to the Pension Fund."

Although clause 4(c) is by no means dispositive of the issue in this case, the arbitrator may well have believed that this clause indicated some flexibility on the part of the union and the employer to adjust the contributions to the funds.

Moreover, the arbitrator may well have determined that the intent of the parties when they agreed to the MFN clause was to avoid overfunding the pension fund, which would result in adverse tax consequences to the employers. The district court held that the employers had been concerned with possible overfunding of the pension fund during negotiations for the MOA, and that the union had informed the employers that the pension fund was not overfunded. The arbitrator, however, did not refer directly to adverse tax consequences as a basis for its award.

Since the rationale behind the arbitrator's award was supported at least in part by extrinsic evidence of the parties' intent, we hold that the district court was not clearly erroneous in concluding that the arbitrator was interpreting the contract itself, and was not merely administering his own brand of "industrial justice".

## III.

To summarize:

We affirm the district court's judgment confirming the arbitrator's award.

*Affirmed.*