LOCAL UNION NO. 38, Sheet Metal Workers' International Association, AFL—CIO, Plaintiff,

v.

HOLLYWOOD HEATING & COOLING, INC., Defendant.

Nos. 98 Civ. 5862(CM), 99 Civ. 10963(CM).

United States District Court, S.D. New York.

March 16, 2000.

Jeffrey S. Dubin, Huntington, NY, for plaintiff.

Steven Felsenfeld, Peekskill, NY, for defendant.

## AMENDED MEMORANDUM ORDER AND DECISION GRANTING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

McMAHON, District Judge.

In two separate actions, Plaintiff Local Union No. 38 ("Local 38") brought claims under Section 301 of the Labor–Management Relations Act of 1947, as amended, 29 U.S.C. § 185, to confirm three arbitration awards rendered under a collective bargaining agreement between Local 38 and Defendant Hollywood Heating & Cooling, Inc. ("Hollywood"), and to recover attorneys' fees and costs in connection with both actions. In the first action, Local 38 has moved for summary judgment; in the second, Hollywood has moved to dismiss, but concedes that its motion is properly treated as a motion for summary judgment, and Local 38 has cross-moved for summary judgment. For the reasons that follow, Local 38's motions in both actions are granted.

*Background*[1]

Defendant Hollywood is a contracting business engaged in the building and construction industry, and is located in Verplanck, New York. Plaintiff Local 38 is based in Brewster, New York, and represents employees in the sheet metal, heating, ventilating and air conditioning indus-

1. Hollywood failed to submit with its response papers in the first suit a Statement of Material Facts as required by Local Rule 56.1 of the Southern and Eastern Districts of New York, and did not do so until February 15 of this year, nearly two months after filing its opposition brief. Failure to comply with Local Rule 56.1 permits a district court, in its discretion, to deem admitted all disputed facts, *see Dusanenko v. Maloney*, 726 F.2d 82, 84 (2d Cir.1984), a measure that Local 38 urges me to take. Because other grounds exist upon which to grant Local 38's motion, I decline to do so in this case.

tries. Local 38 and Hollywood are parties to a collective bargaining agreement ("CBA") entered into on September 9, 1997 (attached as Exhibit A to Plaintiff's Notice of Motion). Article XIII, Section 1 of the CBA provides that the CBA is effective from July 1, 1997 to June 30, 1998, but further provides that the CBA continues in force from year to year after June 30, 1998, unless either party serves a notice of reopening, not less than 90 days prior to the termination date. It is undisputed that Local 38 never served a notice of reopening and that the agreement remained in effect through June 30, 1999.

Article X, Section 1 of the Agreement provides that "[g]rievances of the Employer or the Union, arising out of interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved and the duly authorized representative of the Union, if possible." In the event that a grievance cannot be so settled, Section 2 provides that the dispute "may be appealed by either party to the Local Joint Adjustment Board," which consists of representatives of the Union and of the local Employers' Association. Except in the case of a deadlock, "a decision of a local Joint Adjustment Board shall be final and binding." In the event of deadlock or failure to act by the Local Board (or where an Employer is not a party to the Labor Agreement in the area where the dispute arises), Section 3 provides for a right of appeal to the National Joint Adjustment Board.

### (1) The July 1998 and September 1998 Awards

On June 22, 1998, Local 38 filed a grievance with the Local Joint Adjustment Board ("the Board"), alleging that Holly-wood violated the CBA by hiring non-union employees. Charles Simmons, Hollywood's Vice President, was present at a hearing held before the Board on July 1, 1998. (Affidavit of Charles E. Simmons ¶ 17, attached as Exhibit A to Defendant's Memorandum of Law.) In a decision dated July 14, 1998, the Board found that Hollywood "violated Article V of the Agreement by hiring non-union personnel and not making Funds Contributions for hours worked in the Pension, Health, Welfare and Insurance Funds," and issued an award of $18,657.60. (Local Joint Adjustment Board decision dated July 14, 1998, attached as Exhibit D to Plaintiff's Notice of Motion.) The decision provided that Hollywood was to pay the award within 30 days from the decision date, but Hollywood did not do so.[2] Local 38 brought the instant action on August 17, 1998 to enforce the award.

On August 28, 1998, Local 38 filed a second grievance with the Board, also based on a charge of hiring non-union employees in contravention of the CBA, and another hearing was held on September 2, 1998. The Board's decision, dated September 3, 1998, indicates that no Hollywood representative attended that hearing, (Local Joint Adjustment Board decision dated September 3, 1998, attached as Exhibit G to Plaintiff's Notice of Motion), and Hollywood does not dispute that it was absent. The Grievance Form reveals that Local 38 attempted to resolve the grievance by phoning Hollywood on August 24 and leaving a message, and that Hollywood did not return the call. (Grievance Form dated August 28, 1998, attached as Exhibit E to Plaintiff's Notice of Motion.) While Simmons states that he has "no record of such a phone call ever being received" in connection with the September 2 hearing

---

2. Simmons avers that on or about July 3, 1998, Local 38 filed charges against him personally, and held a hearing on August 5, after which the Board awarded damages of $37,-536.00 against him. Simmons further states that Local 38 filed suit in federal court to enforce that award, but withdrew the action after Simmons' attorney filed NLRB charges upon which the NLRB advised it would issue a complaint. (Simmons Aff. ¶ 23.) The docket report indicates that there was such a litigation, see *Local Union No. 38 v. Simmons*, No. 98 Civ. 7571, filed in October 1998, stayed in January 1999, and discontinued with prejudice in May 1999. However, Hollywood has provided no record of that action or of any communication from the NLRB.

(Simmons Aff. ¶ 30), he does not dispute having received advance notice of the grievance and hearing. Furthermore, Local 38 has submitted a copy of a notice of the September 2 hearing dated August 31, 1998 and an Airborne Express receipt for that notice (though no evidence of receipt by Simmons). (Local Joint Adjustment Board letter dated August 31, 1998, attached as Exhibit F to Plaintiff's Notice of Motion.) Simmons does not dispute having received that letter.

In a decision dated September 3, 1998, the Local Board again issued an award in Local 38's favor, finding violations of Articles II, III, and V of the Agreement in Hollywood's hiring of non-union employees and failure to make contributions for hours worked in the Pension, Health, Welfare and Insurance Funds. (Local Joint Adjustment Board decision dated September 3, 1998, attached as Exhibit G to Plaintiff's Notice of Motion.) The Board awarded damages in the amount of $36,405.60, which Hollywood again did not pay. On October 13, 1998, Local 38 filed an Amended Complaint, seeking (1) confirmation of the July 1998 award; (2) confirmation of the September 1998 award; and (3) attorneys' fees and costs incurred by Local 38 in bringing this action.

Meanwhile, Hollywood filed charges with the National Labor Relations Board ("NLRB") stemming from Simmons' allegations that Steven Bender, Local 38's Union Representative for residential workers, fraudulently induced Simmons into entering into the CBA based on Bender's repeated statements to Simmons that Hollywood could not work in the sheet metal field without being a member of Local 38, and that Bender and Gino Columbo, Local 38's President, coerced Hollywood into entering into the CBA.[3] The charge alleged

---

3. With respect to his allegation of fraud, Simmons' affidavit states the following:

4. Each time I mentioned my desire to quit the Union, Steve [Bender] told me that I couldn't if I wanted to work in the sheet metal field. On one occasion in particular, I recall Steve telling me that when I had signed my contract to be a Union member that I committed that I would only work in the sheet metal field as a Union member. I asked Steve to show me the contract. Steve said that he would have to get the papers from my file. He never did show them to me.

5. At the time I formed Hollywood Heating & Cooling, Inc. ("Hollywood") with Doug Lapolla ("Doug"), around mid-July 1997, I told Steve that I didn't want to be a Union shop and that I wanted to quit my Union membership. Steve told me that I should think about it because I couldn't do both, i.e., be in the business of doing sheet metal and not be Union. If I wanted to be in business doing sheet metal then I had to be Union.

6. ... Steve told me that Gino [Columbo] ... wanted to "get me on this." Steve told me that Gino had tried to contact me by phone and that Gino felt that I was avoiding him, and that I either had to sign the Union Agreement or return to work through the Union.... Again, Steve told me that there was no way out of the Union unless I stopped working in the sheet metal field.

7. ... [At a September 5, 1997 meeting in Croton] Steve said if I left the Union I'd have to go in to some other line of business, as I couldn't have a non-Union company doing sheet metal work.

As to his allegations of coercion, Simmons avers:

7. [At the September 5 meeting] I told Steve that I felt like I'd joined the Mafia. Steve told me that I could not get out and if I didn't sign the Agreement that the Union would come after me, "physically, mentally, and financially."

. . . .

9. Following this meeting, and feeling that I had no other choice, on or about September 9, 1997, I signed the Union Agreement.

. . . .

13. During this same time period, Gino placed phone calls to my home attempting to coerce me into signing this new Union agreement and spoke rudely to both my wife and daughter.

. . . .

15. [At a June 30, 1998 meeting at the Union hall with Bender and Fund Manager Kenny Colombo (Gino's brother) ] I came and told them that I was just starting business again and did not have the kind of money for the payments they were talking about. Again, I asked that I be released from the Union and that I be permitted to build my business. Steve said that. we should speak to Gino.

16. ... Gino screamed at Steve that he should tell me that I should "get the F___ out of here and come back tomorrow for the meeting [i.e., the July 1 hearing before the Local Board]."

that Local 38 violated (1) section 8(b)(4)(ii)(A) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, by coercing Hollywood into entering into the CBA, (2) sections 8(b)(4)(ii)(A) and 8(b)(1)(A) of the NLRA by filing grievances and seeking enforcement of the subsequent awards by means of a suit under section 301 of the LMRA, and (3) another NLRA provision, not specified in the parties' supporting papers, by forcing Simmons to remain a member of the union. Hollywood then moved to dismiss the amended complaint pursuant to Fed. R.Civ.P. 12(b)(6), or, in the alternative, to stay this action pending the outcome of the NLRB's investigation. This Court granted Hollywood's request to stay the proceedings for 60 days on November 24, 1998, and extended the stay for an additional 60 days on February 8, 1999.

On January 29, 1999, the NLRB, Region 34, Hartford, issued a determination (1) refusing to issue complaint on the first charge, because the allegedly unlawful conduct occurred more than six months before the charge was filed, in which circumstance section 10(b) of the NLRA precludes issuance of a NLRB complaint; (2) refusing to issue complaint on the second charge on the ground that the section 8 of the NLRA is not violated where, as here, the filing of grievances and a suit to confirm the arbitration awards was grounded on alleged breaches of the CBA and the union's "colorable claim" that the agreement was renewed; and (3) retaining for further processing Local 38's allegation that Local 38 "forced" Hollywood to remain a member of Local 38. (Letter dated January 29, 1999 from Jonathan Kreisberg to Steven Felsenfeld, Esq., attached as second Exhibit C to Plaintiff's Notice of Motion.)

Hollywood appealed that decision to the NLRB General Counsel in Washington, D.C. In a letter dated April 30, 1999, the NLRB Office of Appeals upheld the Acting Regional Director's determination for the reasons set forth in the January 29 letter. (Letter dated April 30, 1999 from Yvonne T. Dixon to Steven Felsenfeld, Esq., attached as second Exhibit D to Plaintiff's Notice of Motion.) Additionally, the Office of Appeals determined that the tolling of NLRA section 10(b) as a result of alleged coercion by Local 38 was unwarranted, even though the union may have provided misleading information regarding legal issues, because "the Employer could had [sic] obtained correct information from several public sources." The Office of Appeals also rejected Hollywood's contention that Hollywood had effectively terminated the CBA during its term through Hollywood's oral and written statements of repudiation, citing NLRB law for the rule that a party may not lawfully repudiate a section 8(f) "pre-hire" agreement, such as the CBA in this case, during its term.

### (2) Attempted Renegotiation of the CBA and Subsequent Arbitration

As detailed in his affidavit, Simmons, in conversation with Bender and Columbo, repeatedly told Local 38 that he "repudiated" the CBA pursuant to Section 8(f) of

---

17. [At the hearing] Gino took over and cursed and screamed at me that I had a non-Union worker, and that I was a taker and not a giver. I stood up and pleaded with the assembled, "just throw me out of the Union, I don't want to be a part of it, I just want to be released." The assembled yelled at me that I had signed an Agreement and that they wouldn't let me get out of it, that I should close my business and come back to work for a Union contractor. Gino continued to curse and scream at me ... When Gino finally stopped screaming, I was advised that they were going to "review the information, and let me know."

. . . .

20. [After Bender came to a Hollywood job site and made a failed attempt to induce Simmons into signing a second agreement on July 2, 1998], Steve went back to his car and returned with a copy of [the Union constitution], which he then gave to me. Until that day ... I had never been provided with, or saw, a copy of the Union's Constitution. Steve told me to read the tabbed pages and get a good labor lawyer.

(Affidavit of Charles E. Simmons, attached as Exhibit A to Defendant's Memorandum of Law.)

the NLRA and no longer considered the agreement to be effective. And on at least four occasions, according to Simmons' affidavit, Simmons refused to sign a new agreement proposed by Local 38 with a term running from July 1, 1998 through June 30, 2002. (Simmons Aff. ¶¶ 11, 13, 18, 20.) On April 3, 1999, Local 38's attorney sent Simmons a letter stating that pursuant to Article XIII, Section 1 of the CBA, the agreement continued in effect until negotiations for a new agreement were completed, and advising Hollywood that Local 38 wished to initiate negotiations for a new agreement. (Letter from Jeffrey S. Dubin to Charles E. Simmons dated April 3, 1999, attached as Exhibit 5 to Plaintiff's Notice of Motion.) On April 8, Hollywood's attorney sent a reply letter restating Hollywood's position that the CBA was a pre-hire agreement voidable under Section 8(f) of the NLRA, and asserting that no further negotiations were warranted given that Hollywood had already repudiated the CBA, and thus, it no longer existed. (Letter from Steven Felsenfeld to Jeffrey S. Dubin dated April 8, 1999, attached as Exhibit 6 to Plaintiff's Notice of Motion.) As provided under Article X, Section 8 of the CBA, which applies to deadlock over renegotiations of the CBA, Local 38 initiated arbitration before the National Joint Adjustment Board ("the National Board"). It is undisputed that Hollywood received notice of a hearing which was held before the National Board on September 13, 1999, and that Hollywood was not present at that hearing. On September 14, the National Board, taking into account Hollywood's refusal to participate in the CBA's renegotiation, rendered a decision ordering Hollywood to execute a new agreement, incorporating the same terms as the old agreement, to be effective from July 1, 1999 to April 30, 2002. (Decision of National Joint Adjustment Board dated September 14, 1999, attached as Exhibit 9 to Plaintiff's Notice of Motion.)

On November 1, 1999, Local 38 filed (1) a motion for summary judgment in the first suit, seeking confirmation of the July and September 1998 awards, and (2) a new complaint seeking to confirm the September 15 decision of the National Board. Hollywood has filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6) in the second action, which it asks the Court to treat as a motion for summary judgment; Local 38 has filed a cross-motion for summary judgment in that suit. Each of the cases are dealt with in turn.

Hollywood further asks this Court to stay resolution of the second suit pending resolution of the first. This request is denied. Because the two cases involve disputes between the same parties under the same agreement, I will dispose of both of them in this opinion.

## Standard for Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## Discussion

The Second Circuit has held repeatedly that district courts are to accord arbitrators an exceptionally high degree of deference in reviewing labor arbitration awards. *See, e.g., Local 97, Int'l Brotherhood of Electrical Workers v. Niagara Mohawk Power Corp.,* 196 F.3d 117, 124 (2d Cir.1999); *Wackenhut Corp. v. Amalgamated Local 515,* 126 F.3d 29, 31 (2d Cir.

1997) (citations omitted). Specifically, a district court's review is confined to two questions: first, "whether the arbitrator acted within the scope of his authority," and second, "whether the award draws its essence from the agreement or is merely an example of the arbitrator's own brand of justice." *Local 1199, Drug, Hospital and Health Care Employees Union v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir.1992) (citing *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). Under this standard, "an arbitration award must be upheld when the arbitrator 'offer[s] even a barely colorable justification for the outcome reached.'" *Wackenhut*, 126 F.3d at 31 (quotation omitted). "The contractual theory of arbitration ... requires a reviewing court to affirm an award it views as incorrect—even very incorrect—so long as the decision is plausibly grounded in the parties' agreement." *Id.* In sum,

> refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards. *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

### (1) The First Case: 98 Civ. 5862

■ Applying these factors to Local 38's first suit, the first question in this Court's analysis is whether the arbitrator acted within the scope of his authority in rendering the awards against Hollywood. An arbitrator's scope of authority "generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission." *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987). Article X, Section 1 of the CBA states that grievances "arising out of interpretation or enforcement of this Agreement" are to be settled directly between the Employer and the Union. Where such

resolution proves impossible, Section 2 provides that grievances, as defined in Section 1, may be appealed to the Local Joint Adjustment Board, whose decision is final and binding. Sections 1 and 2 of Article X thus reflect the unambiguous intent of the parties to submit to, and be bound by, arbitration of disputes arising from the CBA provisions. Clearly, then, the Local Board was acting within the scope of the authority conferred upon it by the CBA in determining that Hollywood violated Articles II, III, and V.

■ The next question is whether each of the Local Board's decisions "drew its essence" from the CBA. This inquiry requires a court to determine "whether the arbitrator interpreted an arguably ambiguous contractual provision in light of the intent of the parties, or merely administered his own brand of justice in contradiction of the clearly expressed language of the contract." *Local 1199*, 956 F.2d at 26. In order to satisfy this standard, the arbitrator "need only explicate his reasoning under the contract 'in terms that offer even a barely colorable justification of the outcome reached.'" *In re Marine Pollution Serv.*, 857 F.2d 91, 94 (2d Cir.1988) (quoting *In Matter of Andros Compania Maritima, S.A. and Marc Rich & Co.*, 579 F.2d 691, 704 (2d Cir.1978)). "So long as the award does not directly contradict the express language of the collective bargaining agreement, the award will generally be held to draw its essence from the agreement." *Local 813, Int'l Brotherhood of Teamsters v. Pioneer Carting Corp.*, No. 96 Civ. 1044, 1997 WL 65909, *2 (S.D.N.Y. Feb. 13, 1997).

In this case, the Local Board based its awards on violations of Articles II, III, and V of the CBA. Article II states in pertinent part:

> The Employer shall not subcontract, sublet, delegate or assign to or from, any firm, individual or corporation outside the jurisdiction of the Union, sketching, fabrication and erection normally handled by members of shops in

contractual relation with the Union, except with the written consent of a duly constituted Local Adjustment Board.

Article III provides:

The Employer agrees that none but Journeymen, Apprentices and Classified Sheet Metal Workers shall be employed on any work described in Article I and further, for the purpose of proving jurisdiction.

Finally, Article V, Section 1 states:

The Employer agrees to required membership in the Union as a condition of continued employment of all employees performing any of the work specified in Article I of this Agreement, within eight (8) days following the beginning of such employment, or the effective date of this Agreement, whichever is the later, provided the Employer has reasonable grounds for believing that membership is available to such employees on the same terms and conditions generally applicable to other members and that membership is not denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fee uniformly required as a condition of acquiring or retaining membership.

In rendering the July 1998 · award against Hollywood, the Local Board found, "based on the record and the testimony of the parties," that Hollywood hired non-union personnel in violation of Article V, and calculated damages on the following basis:

Mechanic/ $8.97 per hour × 40 weeks × 40 hours/week = $14,352.00

Helper/ $8.97 per hour × 4 weeks × 40 hours/week = $1,435.20

Journeyman/ $8.97 per hour × 8 weeks × 40 hours/week = $2,870.40

Following the August hearing, the Local Board again determined, based on the record and testimony before it, that Hollywood hired non-union personnel, in violation of Articles II, III, and V, and assessed damages based on the following calculation:

Mechanics (5) × 21 days × 8 hrs/day × $26.70 per hour = $22,428

■ The Local Board thus provided "colorable justification" for its awards: each was clearly based on provisions of the CBA and detailed damage assessments that identified each non-union employee and duration of employment. Hollywood does not argue that the Local Board's determinations in any way contradicted the terms of the CBA. Accordingly, the awards sufficiently "drew their essence" from the agreement as that standard has been construed in this circuit. *See, e.g., In the Matter of Arbitration between Soft Drink and Brewery Workers· Union Local 812, IBT, AFL—CIO and Ali–Dana Beverages, Inc.,* No. 95 Civ. 8081, 1996 WL 420209, *2 (S.D.N.Y. July 25, 1996) (arbitration award drew its essence from CBA where arbitrator based award on agreement provisions requiring employer to remit particular fees and dues to union and employer did not deny violations alleged).

The July and September awards therefore fall well within the legal standard for confirmation, a conclusion that Hollywood appears not to challenge, as it addresses neither the scope of the arbitrator's authority nor the "essence" of the CBA. Rather, Hollywood's argument in opposition to summary judgment consists of the same contentions it made before the NLRB, specifically: (1) the six-month statute of limitations under NLRA § 10(b) for filing NLRB charges, upon which the NLRB Regional Director and General Counsel relied in part in declining to issue a charge, should have been tolled because Stephen Bender, Local 38's union representative, fraudulently told Simmons that Hollywood could not go into business without joining the union; and (2) Hollywood effectively repudiated the CBA under § 8(f) of the NLRA, contrary to the NLRB's determination,· through several verbal and written communications to Bender and Gino Colombo, Local 38's President, stating Simmons' desire to leave the union. (*See* Simmons Aff. ¶¶ 4, 6, 11,

15, 17, 18;  Letters from Steven Felsenfeld, Esq. to Gino J. Colombo, dated July 17 and July 20, 1998, attached as Exhibit A2 to Defendant's Memorandum of Law).

Hollywood devotes almost the entirety of its brief to discussion of federal and NLRB case law interpreting these NLRA provisions and challenging the findings of the NLRB Regional Director and General Counsel.  The NLRB's determination in a collateral proceeding, however, is immaterial to the analysis.  And to the extent that Hollywood is reiterating the arguments it made in the NLRB charge for the purpose of establishing that the Local Board's decisions were erroneous, its argument is equally irrelevant.  As discussed, the only issues for a reviewing court are whether the arbitrator acted within the scope of his authority, and whether the arbitrator's ruling drew its essence from the collective bargaining agreement.  So long as both of those factors are satisfied—as I have determined them to be in this case—the merits of the arbitrator's decision, which is what Hollywood in effect is asking me to review, are beyond the purview of this Court.  *See Sheet Metal Workers' Int'l Assoc. Local Union No. 359 v. Madison Ind., Inc. of Arizona,* 84 F.3d 1186, 1190 (9th Cir.1996) (citing *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)).

■ Hollywood further argues that what it characterizes as the "Mafia-like tactics of Gino Columbo" at the July hearing indicates that the July award was procured through "evident partiality." (Def.Br. at 21.)  Hollywood is correct that, under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.,* an arbitration award may be vacated if the arbitrator demonstrates "evident partiality."  *See id.* § 10(b).  Evident partiality exists "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Local 814, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. J & B Systems Installers & Moving, Inc.,*

878 F.2d 38, 40 (2d Cir.1989) (citation omitted).  For example, the Second Circuit vacated an arbitration award on the ground of evident partiality where the sole arbitrator was the son of an official of a union involved in the controversy, reasoning that more often than not, sons are partial to their fathers.  *See Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds,* 748 F.2d 79, 84 (2d Cir.1984).

■ Here, Hollywood contends that the hostility of Columbo, as described by Simmons, at the July hearing raises a question of fact as to whether Columbo's demeanor influenced the Local Board in Local 38's favor.  Hollywood asserts that Columbo "took it upon himself to act as prosecutor, judge, and jury" (Def.Br. at 21), and reasons that partiality of the Local Board was the inevitable consequence of that behavior.  I disagree.  Hollywood's only supporting evidence is Simmons' affidavit, which states that Columbo repeatedly "cursed and screamed" at Simmons over Hollywood's hiring of a non-union worker, and referred to Simmons as "a taker and not a giver." (Simmons Aff. ¶ 17.)  Simmons' account of the hearing, however, reveals no more than the animus that typically accompanies adversarial legal proceedings; it certainly does nothing to suggest that the Local Board was in any way swayed by Columbo's belligerence or otherwise biased against Hollywood.  Hollywood's contention that the July award must be vacated on the basis of evident partiality therefore fails.

■ Moreover, even if Hollywood had viable grounds for challenging the awards, it is too late for Hollywood to raise them.  A party opposing confirmation of an arbitration award may not "sit back with impunity until faced with a motion for summary judgment in federal district court." *Local Union No. 36, Sheet Metal Workers' Int'l Assoc. v. Atlas Air Conditioning Co.,* 926 F.2d 770, 772 (8th Cir. 1991).  With respect to both awards, Hollywood took no steps whatsoever to raise

its claims of fraudulent inducement, coercion or partiality—which it invites me to adjudicate now—before or during the arbitration hearings. Hollywood has not even asserted that it addressed these issues at the July hearing (the only one at which it was present). Nor has Hollywood brought a counterclaim to vacate the award. Hollywood responds that its failure to seek vacatur is excusable because it has not yet been required to serve an answer, as the pre-trial motions in this case have not yet been decided. I reject this argument. Hollywood had the option of appearing in the action and filing suit to vacate the awards, and its failure to do so precludes it from opposing the awards based on fraud or coercion by Local 38. *See id.* ("An employer may not assert a defense to a motion to enforce an arbitration award that could have been raised in an action to vacate") (citation omitted). With respect to the September award, Hollywood's failure to attend the August hearing preceding that award constitutes a waiver of any merit-based defenses it may have had. *See New York Hotel and Motel Trades Council, AFL—CIO v. Hotel St. George,* 988 F.Supp. 770, 776 (S.D.N.Y.1997).

For the above reasons, summary judgment is granted on Local 38's First and Second Claims for Relief, and the July and September arbitration awards are confirmed.

### (2) The Second Case: 99 Civ. 10963

In the second suit, Hollywood has moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6), but asks that its motion be treated as a motion for summary judgment in view of Hollywood's supporting papers. Its request is granted. Local 38 in turn has cross-moved for summary judgment.

Hollywood argues that the National Board lacked authority to make the September 1999 award because Local 38 failed to give timely notice of its intent to renegotiate the CBA prior to its expiration on June 30, 1999. As such, Hollywood contends, the CBA ceased to exist after that date, and thus, there was no contract pursuant to which the National Board could issue a decision.

With respect to renewal of the CBA, Article XIII, Section 1 states:

This Agreement shall become effective on the 1st day of July, 1997, and shall remain in force and effect until the 30th day of June, 1998, and shall continue in force from year to year thereafter unless written notice of reopening is given not less than ninety (90) days prior to the expiration date.

In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party by written notice, provided, however, that if this Agreement contains Article X, Section 8, it shall continue in full force and effect until modified by order of the National Joint Adjustment Board or until the procedures under Article X, Section 8, have been otherwise completed.

Article X, Section 8, which this provision references, applies to disputes arising out of the failure of the parties to negotiate a renewal of the agreement, and provides for appeal to the National Board in the event of deadlock, as occurred here when Hollywood refused to negotiate a new agreement with Local 38.

Again, this Court's analysis is limited to whether the National Board's arbitration decision was within the scope of the National Board's authority, and whether its decision was drawn from the essence of the agreement. The first question requires me to determine whether the CBA remained effective after June 30, 1999, since if it did not, the parties did not intend to be bound after that date, and the National Board clearly would have acted without authority in issuing its decision in September 1999.

The record before me indicates that neither party ever served a notice of reopening prior to April 3, 1999, when Local 38's attorney communicated the union's desire

to initiate renegotiation of the CBA. Therefore, based on the unambiguous language of Article XIII, Section 1, I find that the CBA was renewed on June 30, 1999.

■ Hollywood argues that because Local 38 did not give notice of reopening until its counsel sent the April 3, 1999 letter to Hollywood—88 days prior to the June 30 termination date—Local 38's attempt to reopen the agreement was untimely, and for that reason, the CBA was not renewed. This argument misconstrues the CBA: the 90–day requirement of Article XIII, Section 1 applies only to *termination* of the agreement. This, plainly, is not what Local 38 was trying to do. Rather, Local 38 sought to negotiate a new agreement, not terminate the existing one. To that end, once it became clear that Hollywood would not participate in collective bargaining for a new agreement, Local 38 availed itself of the procedures of Article X, Section 8, which provide recourse to the National Board in the event of deadlock. Article X, Section 8 sets forth no time limitations for bringing a dispute before the National Board, and I reject Hollywood's assertion that Article X, Section 8 incorporates the 90–day advance notice requirement of Article XIII, Section 1. Thus, Hollywood's argument that Local 38's failure to serve its notice of reopening within 90 days of the original agreement's expiration prevented renewal is mistaken.

To the contrary, Article XIII, Section 1 makes clear that failure of the parties to serve notice of reopening within 90 days of the termination date effects a renewal of the agreement for the following year. Hence, neither party was required to perform any affirmative act to extend the CBA's term. (Indeed, Hollywood concedes that the CBA had been renewed for the prior year, on July 1, 1998, because neither party gave notice of reopening. (Def.Br. at 2.)) Hollywood's failure to give notice of reopening by April 1, 1999 thus renewed the CBA for the following year.

■ Hollywood further contends that its "repudiation" of the agreement in its various communications to Local 38 terminated the agreement by July 17, 1998 (the date of its last written repudiation) at the latest. Again, neither party disputes that Hollywood did not serve a timely notice of reopening as required under Article XIII, Section 1. Its repeated oral and written statements of repudiation do not conform to the clearly-specified procedures for termination of the CBA, and therefore did not serve to terminate the agreement.

Because the CBA remained in effect on September 14, 1999, I conclude that the National Board acted within its authority in rendering its decision on that date.

The remaining question is whether the National Board's decision was drawn from the essence of the CBA. The National Board found as follows:

The record reflected that on September 9, 1997, the contractor executed a one year collective bargaining agreement with Local 38, which was effective from July 1, 1997 through June 30, 1998.

The evidence established that neither party reopened the agreement for renegotiations in 1998, and as a consequence, it was renewed by its terms for a period of one year subsequent to June 30, 1998. The agreement was properly reopened for negotiations in 1999, but the contractor refused to negotiate a successor agreement. Therefore, the local union submitted the matter to the NJAB, under the procedures of Article X, Section 8. During the hearing, the local union requested that the employer be directed to execute the multi-employer agreement in place for the area, in its entirety.

A review of the record demonstrated that all procedural requirements had been met, and therefore, the matter was properly before the NJAB for a final and binding decision.

Based upon the complete record, and the testimony of the union during the hearing, the NJAB reached the following unanimous decision:

Hollywood Heating and Cooling, Inc. shall execute a collective bargaining agreement, incorporating the same

terms in effect as under the multi-employer collective bargaining agreement between the local contractors' association, and SMWIA Local 38. Such agreement shall be effective July 1, 1999, through April 30, 2002.

The question before the National Board was whether the CBA was renewed after June 30, 1998, so that the National Board had contractual authority to settle the renegotiation dispute under Article XIII, Section 1, and Article X, Section 8. Thus, the issue of whether the National Board acted within its scope of authority overlaps the issue of whether the National Board's decision drew its essence from the agreement, since both hinge upon the common question of whether the CBA remained in effect after June 30, 1999. Because Article XIII, Section 1 and Article X, Section 8 support the National Board's conclusion that the CBA was renewed and that the National Board had authority to determine the terms of the new agreement, for the reasons I have discussed above, the National Board's justification for its decision was more than "colorable." I therefore find that the National Board's September 1999 award drew its essence from the agreement.

Finally, Hollywood raises the same arguments under the NLRA that it raised in the first suit to challenge the validity of the National Board's decision. Again, the merits of the arbitration decision are beyond this Court's scope of review. Moreover, as with the September 1998 award, Hollywood's decision not to take part in the proceedings precludes it from raising merit-based defenses at this stage. The September 1999 decision of the National Board is therefore confirmed.

### (3) Local 38's Application for Attorney's Fees

Pursuant to the CBA, Local 38 has applied for attorneys' fees and costs in connection with this litigation. Article X, Section 6 of the CBA provides:

> In the event of non-compliance within thirty (30) calendar days following the mailing of a decision of a Local Joint Adjustment Board, Panel or the National Joint Adjustment Board, a local party may enforce the award by any means including proceedings in a court of competent jurisdiction in accord with applicable state and federal law. If the party seeking to enforce the award prevails in litigation, such party shall be entitled to its costs and attorney's fees in addition to such other relief as directed by the courts.

Accordingly, Local 38, as the prevailing party, is awarded its fees and costs in both actions.

For the foregoing reasons, Local 38's motions for summary judgment in the actions 98 Civ. 5862 and 99 Civ. 10963 are granted in their entirety; Hollywood's motion to dismiss in the second suit is denied; and Local 38's application for attorneys' fees and costs under the CBA is granted. Local 38 is hereby directed to file an affidavit of fees and costs in accordance with the deadline set forth in the Court's decision and order dated March 8, 2000.

As there are no further issues in these actions, the oral argument scheduled for March 17, 2000 is canceled.

This constitutes the order and decision of the Court.