KATZMANN, Chief Judge,
dissenting:
Article 46 of the Collective Bargaining Agreement between the NFL Players Association (the “Association”) and the, NFL Management Council requires the Commissioner to provide a, player with notice of the basis for any disciplinary action and an opportunity to challenge the discipline in an appeal hearing. When the Commissioner, acting in his capacity as an arbitrator, changes the factual basis for the disciplinary action after the appeal hearing concludes, he undermines the fair notice for which the Association bargained, deprives the player of an opportunity to confront the case against him, and; it follows, exceeds his limited authority under the CBA to decide “appeals” Of disciplinary decisions. ■
In its thorough and thoughtful opinion, the majority does not contest this understanding of the CBA. Instead, it asserts that the Commissioner did not change the factual basis for the discipline and, in effect, that any change was harmless. I cannot agree.
Additionally, on a more fundamental level, I am troubled by the Commissioner’s decision to. uphold the unprecedented four-game suspension. The Commissioner failed to even consider a highly relevant alternative penalty and relied, instead, on an inapt analogy to the League’s steroid policy. This deficiency, especially when viewed in combination with the - shifting rationale for Brady’s discipline, leaves me to conclude that the Commissioner’s decision reflected “his own brand, of industrial justice.” United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).
For these reasons, I respectfully dissent.
I.
Judicial review of an arbitration award can be boiled down to a two-step process. Both, inquiries follow from the fundamental premise-that “arbitration is a matter of contract.” United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). In the first step, the reviewing.court asks whether the arbitrator acted' within the scope of his authority under the relevant collective bargaining agreement. See Local 1199, Drug, Hosp. & Health Care Emp. Union, RWDSU, AFL-CIO v. Brooks Drug Co., 956 F.2d 22, 25 (2d Cir.1992). This ensures that a party is not forced “to ■submit to arbitration any dispute which he has not agreed so to submit.” Warrior & Gulf Nav. Co., 363 U.S. at 582, 80 S.Ct. 1347. If the arbitrator acted within the scope of his authority, then his decision is entitled to substantial deference. The award will be upheld so long as the reviewing court finds, at the second step, that the arbitral award “draws its essence from the agreement” and does not reflect “merely an example of the arbitrator’s own brand of justice,” Brooks Drug Co., 956 F.2d at 25. This guarantees that the parties get what they bargained for, namely, the' arbitrator’s construction of the CBA. Enter. Wheel & Car Corp., 363 U.S. at 599, 80 S.Ct. 1358. In my opinion, the Commissioner’s decision fails as to both steps.
IL
With regard to .the first step, Article 46 of the CBA vests the Commissioner with exceptional discretion to impose discipline for “conduct detrimental,” but it checks that power by allowing-the player to-challenge that discipline through an “appeal.” Joint App. at 345-46. In deciding the appeal, the arbitrator may decide whether *550 the misconduct charged actually occurred, whether it was actually “detrimental” to the League, and whether the penalty imposed is permissible under the CBA. But the arbitrator has no authority to base his decision on misconduct different from that originally charged. When he does so, the arbitrator goes beyond his limited authority, and the award should be vacated.
I would find that the Commissioner breached that limitation here. I believe there are significant differences between the limited findings in the Wells Report and the additional findings the Commissioner made for the first time in his final written decision. The letter announcing Brady’s discipline explained that his “actions as set forth in the [Wells Report] clearly constitute^] conduct detrimental to the integrity of and public confidence in the game of professional football” and warranted a four-game suspension. Joint App. at 329-30. The Wells Report, in turn, concluded that it was “more probable than not that Tom Brady .,. was at least generally aware of the inappropriate activities of [Jim] McNally and [John] Jastremski involving the release of air from Patriots game balls,” Joint App. at 97, and that it was “unlikely” that McNally and Jastrem-ski deflated the balls without Brady’s “knowledge,” “approval,” “awareness,” and “consent,” Joint App. at 114. The Commissioner’s final written decision, however, went further. It found that Brady “knew about, approved of, consented to, and provided inducements and rewards in support of a scheme by which, with Mr. Jastrem-ski’s support, Mr. McNally tampered with the game balls.” Special App. at 51 (emphasis added).
Regardless of whether the difference between the Wells Report and the Commissioner’s decision constitutes a “quantum leap,” Maj. Op. at 542,1 am convinced that the change was material. The misconduct found in the Wells Report is indisputably less culpable than inducing and rewarding cheating through the payment of memorabilia, as was found in the Commissioner’s final decision.
The majority takes the view that the Wells Report’s conclusions clearly encompassed a finding that Brady induced and rewarded the deflation of footballs. To the contrary, although the Wells Report described evidence that Brady provided both McNally and Jastremski with gifts and that McNally joked about demanding cash and other memorabilia, it never concluded that it was “more probable than not” that the gifts Brady provided were intended as rewards or advance payment for deflating footballs in violation of League rules. That stands in stark contrast to the Wells Report’s clear conclusions, by a preponderance of the evidence, regarding Brady’s “knowledge,” “approval,” “awareness,” and “consent.” Fairly read, the Wells Report did not put Brady on notice that he was found to have engaged in a quid pro quo.[1]
*551 I would also find that Brady was prejudiced by the change in the -Commissioner’s rationale and the resulting lack of notice. The Association, in light of the lack'of any clear finding in the Wells Report as to the purpose of, the gifts, paid almost no attention to Brady’s gift-giving during the appeal hearing. To support Brady’s argument that he had no relationship with McNally,’ counsel for the Association asked Brady on direct examination whether he ever provided gifts to people he did not know, and Brady’s affirmative response was then used in his post-hearing brief only to establish that single point. See Dist. Ct. Dkt. No. 28-231 at 15 (Post-Hearing Br. of the NFLPA and Tom Brady) (“The only thing ‘linking’ [Brady And McNally] is that Brady purportedly signed memorabilia for McNally, but Brady testified that he naturally does not know the name of everyone for whom he signs memorabilia, and even Wells found that Brady never provided McNally any year-end gifts or bonuses that would suggest they had any relationship.”). Beyond that, the gifts played nó rolé in the Association’s challenge to Brady’s discipline: the League did not ask Brady about gifts to McNally on cross-examination, and neither side asked Brady about any gifts he provided to Jastremski.
The Association’s silence on this issue, however, seems to me to reflect only the lack of notice, not the lack of an available argument or a tactical decision to focus on other issues. The Wells Report found that McNally referred to himself as “the deflator” and threatened (perhaps jokingly) to go to ESPN as far back as May 2014, but it also credited McNally’s statement that Brady never provided him with the same gifts doled out to other employees in the locker room.[2] The suggestion that McNally did. not receive gifts from Brady even during the period in which McNally sent suspicious text messages is further corroborated by an October 2014 text message in which Jastremski told McNally that Brady “gives u nothing.” Joint App. at 101. Finally, it appears undisputed in the Wells Report that Brady provided gifts to other locker room attendants who have not been implicated'in the deflation (or any other) scheme. Brady’s gift-giving, in other words, was not necessarily indicative of illicit behavior.
None of this is to say that the inferences that the Commissioner drew from the evidence presented in the Wells Report constituted reversible error on their own. But the foregoing demonstrates that.the Association would have been able to offer a meaningful challenge to the Commissioner’s conclusion (possibly supported by additional new evidence regarding Brady’s practice of providing gifts) had it been announced prior to the Article 46 appeal hearing. Taking the Commissioner at his word that he “entered into the appeal pro *552 cess open to reevaluating [his] assessment of Mr. Brady’s conduct and the associated discipline,” Special App. at 60, I believe that, had Brady been provided an opportunity to challenge the Commissioners conclusion on this score, the outcome may have been different. The majority’s observation that the Commissioner did not increase Brady’s punishment is beside the point. Had the Commissioner confined himself to the misconduct originally charged, he may have been persuaded to decrease the punishment initially handed down.
Accordingly, I would find that the Commissioner exceeded his authority, to Brady’s detriment, by resting Brady’s discipline on factual findings not made in the Wells Report.[3]
III.
I would also find that the Commissioner’s decision fails at the second step of our analysis because it does not draw its essence from the CBA. It must be emphasized that the case at hand involves an unprecedented punishment. Precisely because of the severity of the penalty, one would have expected the Commissioner to at least fully' consider other alternative and collectively bargained-for penalties, even if he ultimately rejected them. Indeed, the CBA encourages — though, as the majority observes, does not strictly require — the Commissioner to fully explain his reasoning by mandating that he issue a written decision when resolving an Article 46 appeal. That process is all the more important when the disciplinary action is novel and the Commissioner’s reasoning is, as here, far from obvious.
Yet, the Commissioner failed to even mention, let alone explain, a highly analogous penalty, an omission that underscores the peculiar nature of Brady’s punishment. The League prohibits the use of stickum, a substance that enhances a player’s grip. Under a collectively bargained-for Schedule of Fines, a' violation of this prohibition warrants an $8,268 fine in the absence of aggravating circumstances. Given that both the use of stickum. and the deflation of footballs involve attempts at improving one’s grip and evading the referees’ enforcement of the rules,[4] this would seem a natural starting point for assessing: Brady’s penalty. Indeed, the .League’s justification for prohibiting stickum — that it “affects the integrity of the competition and can give a team an unfair advantage,” Joint App. at 384 (League Policies for Players) — is nearly identical to the Commissioner’s explanation for what he found problematic about the deflation — that it “reflects an improper effort to secure a competitive advantage in, and threatens the integrity of, the game,” Special App: at 57.[5]
*553 Notwithstanding these parallels, the Commissioner ignored the stickum penalty entirely. This oversight leaves a noticeable void in the Commissioner’s decision,[6] and in my opinion, the void is indicative of the award’s overall failure to draw its essence from the CBA. Even taking into account the special circumstances here— that the alleged misconduct occurred during the AFC Championship Game, that team employees assisted in the deflation, that a deflated football arguably affects every play, and that Brady failed to cooperate in the subsequent investigation — I am unable to understand why the Commissioner thought the appropriate penalty was a four-game suspension and the attendant four-game loss of pay, which, in Brady’s case, is far more than $8,268. The lack of any meaningful explanation in the Commissioner’s final written decision convinces me that the Commissioner was doling out his own brand of industrial justice. Cf. Burns Int’l Sec. Servs., Inc. v. Int’l Union, United Plant Guard Workers of Am. (UP-GWA) & Its Local 537, 47 F.3d 14, 17 (2d Cir.1995) (“/!// a ground for the arbitrator’s decision can be inferred from the facts of the case, the award should be confirmed.)” (quoting Sobel v. Hertz, Warner & Co., 469 F.2d 1211, 1216 (2d Cir.1972)) (emphasis added). In this regard, it bears noting that the Schedule of Fines provides that a player caught violating the prohibition on stickum a second time is to be fined $16,537. Thus, even where aggravating circumstances exist, the Schedule of Fines does not provide for the. extreme increase in penalty that the Commissioner found appropriate here.[7]
In sum, the Commissioner’s failure to discuss the penalty for violations of the prohibition on stickum, the Commissioner’s *554 strained reliance on the penalty for violations of the League’s steroid policy, and the Commissioner’s shifting rationale for Brady’s discipline, together, leave me with the firm conviction that his decision in the arbitration appeal was based not on his interpretation of the CBA, but on “his own brand of industrial justice.” Enter. Wheel & Car Corp., 363 U.S. at 597, 80 S.Ct. 1358.
IV.
The Commissioner’s authority is, as the majority emphasizes, broad. But it is not limitless, and its boundaries are defined by the CBA. Here, the CBA grants the Commissioner in his capacity as arbitrator only the authority to decide “appeals,” that is, whether the initial disciplinary decision was erroneous. The Commissioner exceeded that limited authority when he decided instead that Brady could be suspended for four games based on misconduct found for the first time in the Commissioner’s decision. This breach of the limits on the Commissioner’s authority is exacerbated by the unprecedented and virtually unexplained nature of the penalty imposed. Confirming the arbitral award under such circumstances neither enforces the intent of the parties nor furthers the “federal policy that federal courts should enforce [arbitration] agreements ... and that industrial peace can be best obtained only in that way.” Textile Workers Union of Am. v. Lincoln Mills of Ala., 353 U.S. 448, 455, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).
I end where I began. The Article 46 appeals process is designed to provide a check against the Commissioner’s otherwise unfettered authority to impose discipline for “conduct detrimental.” But the Commissioner’s murky explanation of Brady’s discipline undercuts the protections for which the NFLPA bargained on Brady’s, and others’, behalf. It is ironic that a process designed to ensure fairness to all players has been used unfairly against one player.
I-respectfully dissent.

, The majority also suggests that the Association never raised this issue. Although not every detail I mention is found in the Association’s brief, the concern is not of my own making. See Br. for Appellees Nat’l Football League Players Ass’n and Tom Brady at 49 ("Hoping to compensate for the Wells Report’s limited findings concerning Brady’s state of mind, Goodell pulled his 'partic-ipatpon]’ and 'inducement ]’ language from thin air.”). Indeed, the majority addresses the Association’s challenge to the Commissioner’s shift to a finding of "participation,” and in my view, the Commissioner's decision uses "participation” to refer to not only Brady’s knowledge and approval of the scheme, but also his use of inducements and rewards. The Association’s failure to fully flesh out this argument is, I suspect, a consequence of the district court never having reached the issue, see Nat'l Football League Mgmt. Council v. Nat’l Football League Players Assn, 125 F.Supp,3d 449, 474 (S.D.N.Y.2015), and the majority’s decision (with which I do riot quar *551 rel) to reject the Association’s request to remand on this issue,

. For example, the Wells Report stated the following regarding texts from McNally demanding tickets to a game between the Boston Celtics and Los Angeles Lakers and new Uggs shoes:
McNally described these texts as jokes, which we think is likely the case. Specifically, on December 5, 20Í4, the Boston Celtics were playing the Los Angeles Lakers in Boston and McNally had been asking Jastremski to get them tickets to a Celtics-Lakers game for years. McNally said the joke was that Brady should get them court-side seats for the game. With regard to the Uggs, McNally said that around the holidays each year Brady gives Uggs footwear to certain Patriots staff'members, ■hut that McNally has never received them. He explained that his message was a humorous response to a news report on Brady's distribution of Uggs in -2014.
Joint App. at 183 (emphasis added).

.The Commissioner’s rationale also shifted insofar as he relied on new evidence regarding Brady’s destruction of his cell phone to find that Brady "willfully obstructed” Wells’s investigation. Special App. at 54. The majority- persuasively demonstrates, however, that Brady anticipated this change and challenged it at the hearing and in his post-hear- . ing brief. Thus, I agree that the Commissioner’s reliance on this new evidence does not provide a ground to vacate the suspension. Cf. Duferco Int’l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 390 (2d Cir.2003) ("We will, of course, not vacate an arbitral award for an erroneous application of the law if a proper application of law would have yielded the same result”).

. Just as the referees check the inflation level of the footballs before the start of the game, they check players for stickum "prior to the game and prior to the beginning of the second half.” Joint App. at 384.

. Although the Commissioner reasoned that steroid use also has the same adverse effects on the League, the fact that numerous infractions may be said to compromise the integrity *553 of the game and reflect an attempt to gain a competitive advantage serves only to render more problematic the Commissioner’s selection of what appears to be the harshest potential comparator without any meaningful explanation. This is especially true since, for the reasons stated by the district court, the Commissioner’s analogy to steroid use is flawed. See Nat’l Football League Mgmt. Council, 125 F.Supp.3d at 465. In short, the Commissioner’s reliance on the League's steroid policy seems to me to be nothing more than mere "noises of contract interpretation” to which we do riot ordinarily defer. In re Marine Pollution Serv., Inc., 857 F.2d 91, 94 (2d Cir.1988) (quoting Ethyl Corp. v. United Steelworkers, 768 F.2d 180, 187 (7th Cir.1985)).

. The omission is all the more troubling since the Association raised this poirit during the arbitration proceedings. See Dist. Ct. Dkt. No. 28-231 at 9. (Post-Hearing Br. of the NFLPA and Tom Brady) ("The Player Policies further illustrate the disparate nature of any player suspension for an alleged competitive infraction, let alone for just being 'generally aware' of one. They identify player punishments for equipment violations that ‘affect[] the integrity of the competition and can give a team an unfair advantage’ — such' as putting stickum on receiver gloves .. . — and subject first-time player offenders to a fine of $8,268 for a specified violation.”).

. The majority again gives me too much credit in stating that the Association did not raise this argument. I read the Association's brief to malte two arguments with respect to alternative penalties. The first is that the Player ' Policies, and in particular the "Other Uni- ■ form/Equipment Violations” provision,' governed Brady’s misconduct* here and necessitates that he receive no more than a fine. I agree with the majority tjiat this has no merit. The second, however, is that the Commissioner’s failure' to discuss certain probative terms — in particular, the "Other Urii-.form/Equipment Violations” provision and the stickum prohibition (obviously, I find only the latter actually probative) — reflects that the Commissioner was not actually construing the CBA, the only limitation imposed on an arbitrator acting within the scope of his authority. And, as the majority acknowledges, in support ‘ of that' argument, the Association contends that the Commissioner’s "CBA defiance is only underscored by his reliance on the Steroid Policy.” ’ Br. for Appellees Nat’l Football League Players Ass’n and Tom Brady at 45.